# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-2848

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellant, | * | Appeal from the United States |
| | * | District Court for the |
| v. | * | Eastern District of Arkansas. |
| | * | |
| W. J. B. Axsom, II, | * | |
| | * | |
| Appellee. | * | |
| | * | |

_____

Submitted: December 11, 2001

Filed: May 6, 2002

_____

Before MORRIS SHEPPARD ARNOLD, BEAM, and RILEY, Circuit Judges.

_____

RILEY, Circuit Judge.

W.J.B. Axsom, II (Axsom) filed a motion to suppress inculpatory statements made during a police interrogation conducted in his home. The district court granted the defendant's motion to suppress. The government appeals, and we reverse.

# I. BACKGROUND

On March 3, 1999, at approximately 6:45 a.m., federal agents executed a search warrant on Axsom's residence seeking evidence of child pornography. When the federal agents knocked and announced their presence, Axsom arrived at the door wearing only a towel. Under the direction of FBI Special Agent Jill Hill (Hill), nine federal agents and other employees entered Axsom's house. Upon entering, agents observed dogs inside the residence and directed Axsom to secure the dogs outside. The agents also observed numerous firearms and knives inside the residence, including fifteen shotguns and rifles lying on a kitchen table, another loaded firearm, three Samurai swords, and dozens of display knives and other guns hanging on the walls.

Once the dogs and weapons were secured, Hill and Customs Service Agent Robert Mensinger (Mensinger) directed Axsom to sit down. Hill explained to Axsom that she had a search warrant to search the residence for the presence of child pornography. She informed him that he was not under arrest[1] and that she was interested in speaking with him, if he would like to speak with her. Axsom told Hill he was willing to talk with her. Before commencing the interview, federal agents escorted Axsom to the bedroom to dress.

After dressing, Axsom returned to the living room, sat down on an easy chair and smoked his pipe. Hill and Mensinger sat on a sofa located across from Axsom. Intermittently, over the course of the next hour, Hill and Mensinger interviewed Axsom. At the beginning of the questioning, Axsom stood up to get a drink. Mensinger told Axsom to "hold on just a minute" and asked him what he needed. When Axsom explained he had a dry mouth, Mensinger directed another agent to bring Axsom a glass of water.

---

[1]Axsom did not recall the agent telling him he was not under arrest although he did not deny she may have made that statement.

During the interview, Hill asked Axsom if he lived alone, how long he had owned his computer, what his password was, the name of his Internet service provider, how long he had subscribed to the provider, and for what purposes he used the Internet.[2] Axsom provided the requested information and gave Hill his password. Hill also asked Axsom whether he had downloaded child pornographic images off the Internet into his computer, if he visited news groups and chat rooms on the Internet, and, if so, which ones. Axsom admitted to Hill that he had downloaded child pornography. He did not identify news groups by names, but instead told Hill he enjoyed news groups on certain subjects, including preteens, high heels, nylons, screen savers, and cartoon sounds.

Mensinger asked Axsom whether he had downloaded or transmitted child pornography, and whether he had received foreign manufactured pornography. Axsom replied that he had received some pornography with foreign language script, which he believed had been manufactured abroad. Mensinger also asked Axsom whether he was molesting children. Axsom denied ever doing so. Axsom expressed his need to use the bathroom, and Mensinger escorted him for security reasons.

Execution of the search warrant took approximately two hours. After the interview, and while the agents continued their search, Axsom moved about his residence, answered the telephone, and continued to smoke his pipe. The agents' only concern with Axsom's movements was Axsom obtaining any of the numerous weapons spread throughout the house. Axsom volunteered to show agents which of his two computers contained pornography and offered to show Mensinger his Samurai sword collection.

---

[2]Mensinger testified that an FBI computer specialist secured the computer and asked Axsom several questions concerning the computer, including questions about hookups, encryption devices and booby traps.

During the search, agents discovered a small quantity of marijuana inside the house and contacted the local sheriff's office. Two sheriff officers arrived during the search and issued Axsom a citation. When the search ended at 8:45 a.m., the federal agents departed without arresting Axsom. Several hours later, Axsom phoned the Customs Service office and left a recorded voice message for Agent Mensinger's supervisor commending Mensinger and the FBI for having done "a really professional job" . . . "in a real professional manner." In the same recording, Axsom also said "I done something that was illegal."

Following his indictment, Axsom moved to suppress inculpatory statements made during the interview. Axsom claimed he had been the subject of a custodial interrogation and had not been given a Miranda warning. The district court conducted a suppression hearing and granted the motion to suppress. The district court concluded that the balance of the six factors outlined in United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir. 1990), weighed in favor of suppression. The government filed a motion for reconsideration which the district court denied. This appeal followed.

## II. DISCUSSION

### A. Standard of Review

In Thompson v. Keohane, 516 U.S. 99 (1995), the Supreme Court considered the question whether a state-court "in custody" determination, for purposes of Miranda, is a factual finding entitled to a presumption of correctness under 28 U.S.C. § 2254(d) or a mixed question of law and fact warranting independent review by the federal habeas court. Thompson, 516 U.S. at 106. The Court held that an "in custody" determination requires two discrete inquiries: "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." Id. at 112 (footnote omitted). In contrast to the first inquiry, which is factual, the second inquiry "calls for application of the controlling legal

standard to the historical facts." Id. This ultimate determination, the Court held, "presents a 'mixed question of law and fact' qualifying for independent review." Id.

We first cited Thompson in United States v. McKinney, 88 F.3d 551 (8th Cir. 1996), a case involving a direct appeal of an "in custody" determination. In McKinney, we suggested that, in light of Thompson, the circuit may need to reconsider the applicable standard of review. McKinney, 88 F.3d at 554 n.2. Although we upheld the district court's "in custody" determination utilizing a clearly erroneous standard, we concluded we would have reached the same result if we had applied de novo review under Thompson. Id.

Later, in Evans v. Rogerson, 223 F.3d 869 (8th Cir. 2000), a case brought pursuant to 28 U.S.C. § 2254, we applied the "two discrete inquiries" test outlined in Thompson in analyzing an "in custody" determination made by a state court. Id. at 872-73. Since Evans was decided, the circuit has not revisited Thompson. Recently, in two direct appeals of "in custody" determinations, a clearly erroneous standard of review was utilized. See United States v. Cates, 251 F.3d 1164, 1166 (8th Cir. 2001); United States v. Hanson, 237 F.3d 961, 963 (8th Cir. 2001) (citing McKinney, 88 F.3d at 553).

Seven circuit courts have applied Thompson's standard of independent review in direct appeals of "in custody" determinations made by district courts. See United States v. Hayden, 260 F.3d 1062, 1065 (9th Cir. 2001); United States v. Trueber, 238 F.3d 79, 93 (1st Cir. 2001); United States v. Mahan, 190 F.3d 416, 421 (6th Cir. 1999); United States v. Erving L., 147 F.3d 1240, 1244-46 (10th Cir. 1998); United States v. Sullivan, 138 F.3d 126, 131 (4th Cir. 1998); United States v. Yusuff, 96 F.3d 987-88 (7th Cir. 1996); United States v. Ali, 86 F.3d 275, 276 (2d Cir. 1996). Before Thompson was decided, four other circuit courts applied a de novo standard in reviewing a district court's conclusions of law pertaining to "in-custody" issues. See United States v. Adams, 1 F.3d 1566, 1575 (11th Cir. 1993); United States v. Collins,

972 F.2d 1385, 1404-06 (5th Cir. 1992); United States v. Cruz, 910 F.2d 1072, 1077-78 (3d Cir. 1990); United States v. Baird, 851 F.2d 376, 379 (D.C. Cir. 1988).

In determining whether Axsom was "in custody," we follow our precedent established in Evans and join the other circuit courts in applying a de novo standard of review to all "in custody" determinations, whether appealed directly or brought collaterally. We reject our earlier cases that applied a clearly erroneous standard of review because this standard is inconsistent with Thompson. Accordingly, in reviewing "in custody" determinations, we uphold findings of historical fact unless clearly erroneous, but we apply the controlling legal standard to the historical facts utilizing an independent review. Thompson, 516 U.S. at 112; Evans, 223 F.2d at 872.

## B.    The Interrogation

The rule in Miranda requires that any time a person is taken into custody for questioning, a law enforcement officer must, prior to questioning, advise the individual of his right to be free from compulsory self-incrimination and his right to the assistance of counsel. Miranda v. Arizona, 384 U.S. 436, 444 (1966). A custody determination requires the court to carefully assess "the totality of the circumstances." Hanson, 237 F.3d at 963. The undisputed facts establish that Hill and Mensinger were interrogating Axsom. To determine whether the Miranda rule applies, we must examine whether Axsom's interrogation was custodial.

The "task of defining 'custody' is a slippery one." Oregon v. Elstad, 470 U.S. 298, 309 (1985). This case is no exception and presents a close question. See United States v. Mottl, 946 F.2d 1366, 1369 (8th Cir. 1991). Custody occurs when a suspect is deprived of his freedom of action in any significant manner. Griffin, 922 F.2d at 1347 (citing Miranda, 384 U.S. at 444 and Berkemer v. McCarty, 468 U.S. 420, 429 (1984)). In deciding whether a person was "in custody," we must examine both the presence and extent of physical and psychological restraints placed upon the person's liberty during the interrogation "in light of whether a 'reasonable person in the

-6-

suspect's position would have understood his situation' to be one of custody." Griffin, 922 F.2d at 1347 (quoting Berkemer, 468 U.S. at 442). Thus, if Axsom believed his freedom of action had been restrained to a "degree associated with formal arrest" and his "belief was reasonable from an objective viewpoint," then Axsom was "held in custody during the interrogation." Id. at 1347 (citations omitted).

In Griffin, we outlined six common indicia of custody which tend either to mitigate or aggravate the atmosphere of custodial interrogation. The indicia are:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

Id. at 1349.

The first three indicia are mitigating factors which, if present, mitigate against the existence of custody at the time of questioning. Conversely, the last three indicia are aggravating factors which, if present, aggravate the existence of custody. We have emphasized these six indicia of custody are representative and are not exclusive. A finding of custody does not require the factual circumstances of a case to present all indicia; and a particularly strong showing of one factor may compensate for a lesser or non-existent showing of another factor. Id.

Guided by these principles, we review de novo the district court's application of the Griffin factors to this case. The district court found the absence of any

mitigating factors and a particularly strong showing of one aggravating indicium –
a police-dominated atmosphere. Based on these findings, the district court concluded
the indicia, when balanced, weighed in favor of finding that Axsom's belief that he
was in custody was objectively reasonable under the totality of the circumstances.

The district court found the agents failed to inform the defendant (1) he was not
under arrest; (2) the questioning was voluntary; (3) he was free to leave; or (4) he
could reject the agents' request to answer questions. During the suppression hearing,
Hill and Mensinger testified that Hill told Axsom, before questioning him, that he
was not under arrest. Axsom's testimony did not deny this fact. Axsom explained
"I'm not saying [Hill] did not say that. I'm just saying the words did not register with
me." Furthermore, both Hill and Mensinger testified that Hill told Axsom, before
questioning him, that she would like to talk with him, if he was willing to talk with
her. Axsom's testimony did not dispute this fact. Therefore, we conclude the district
court's factual findings that Axsom was not advised he was not under arrest and the
questioning was voluntary were clearly erroneous. We further conclude the court
erred in not finding the presence of the first mitigating factor.

The district court found the second mitigating factor did not exist because
federal agents restrained Axsom's freedom of movement. In support of its finding,
the district court noted agents escorted Axsom into the bedroom to dress and to use
the bathroom. The record establishes that before the interview commenced, a male
agent escorted Axsom into the bedroom to obtain clothing while a search of the room
was in progress. Mensinger later escorted Axsom to the bathroom, which was located
a short distance from a Samurai sword collection. During the questioning, Axsom
attempted to obtain a drink, but Mensinger stopped him and directed another agent
to bring Axsom a glass of water. Because Axsom was not permitted to move about
at will during the interview, we cannot say the district court erred in finding that the
second mitigating factor was absent.

In considering the third mitigating factor, the district court correctly found that Axsom did not initiate or arrange for the questioning. However, the court failed to analyze the disjunctive prong of the third mitigating factor – whether the defendant voluntarily acquiesced to requests by federal agents to answer questions.[3] At the suppression hearing, Axsom testified that he would have answered any questions asked by the interrogating agents because he believed it was in his own best interest to appear friendly to the agents and to cooperate with their investigation. Axsom's conduct during the interview further supports a finding of voluntary acquiescence. Axsom was extremely friendly and cooperative during the interview. He offered to show agents which of his two computers contained child pornography, the target he shot to obtain his concealed handgun license, and his Samurai sword collection. We, therefore, find the historical facts establish the presence of the third mitigating factor.

Turning to the aggravating factors, the district court made no finding as to whether Hill and Mensinger employed strong arm tactics or deceptive stratagems during their questioning. We find the agents did not. Although armed, the agents did not adopt a threatening posture toward Axsom, display their weapons, or make a physical show of force during the questioning. Nor did the agents perform any deceptive stratagems. Axsom testified the agents asked "straightforward questions" and he gave "straightforward answers." Within hours of the agents' departure from his home, Axsom phoned the Customs Service office and left a voice recording commending Mensinger and the FBI for their professionalism. We, therefore, find the facts fail to establish the presence of the fourth indicium or first aggravating factor.

The district court found that the presence of nine agents and specialists in Axsom's small house established the existence of the fifth indicium – a police

---

[3]Axsom acknowledged he knew from watching TV he did not have to answer the agents' questions.

-9-

dominated atmosphere. The fifth indicium inquires "whether the atmosphere of the questioning was police dominated." Griffin, 922 F.2d at 1349 (emphasis added). While nine persons participated in the execution of the search warrant, only two agents conducted the interview. During the interview, Axsom sat on an easy chair and smoked his pipe while Hill and Mensinger sat across from him on a small sofa. Communication between the agents and Axsom consisted of two-way questioning. The agents asked questions of Axsom, but Axsom also asked the agents questions about search procedures. Photographs of Axsom and federal agents taken at or near the time of questioning reflect a more casual scene than a police dominated, inherently coercive interrogation. When a suspect is interrogated in the comfort and familiarity of his home, a court is less likely to find the circumstances custodial. See United States v. Erving L., 147 F.3d 1240, 1247 (10th Cir. 1998) (quoting 1 W. LaFave, Criminal Procedure § 6.6(e), at 496 (1984 & Supp. 1991)). We, therefore, find the district court erred in finding the presence of the fifth indicium or second aggravating factor.

The district court also failed to document a finding regarding the presence or absence of the sixth indicium or third aggravating factor. At the termination of the questioning, agents did not arrest Axsom. Therefore, we find this historical fact fails to establish the presence of the sixth indicium or third aggravating factor.

Having reviewed the indicia outlined in Griffin, we find the presence of the first and third mitigating factors. Although evidence exists to support the district court's finding that agents restrained Axsom's freedom of action, his freedom was not restrained to a "degree associated with formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983) (per curiam). Axsom was not handcuffed, nor was he confined to one room. Axsom moved throughout his residence. He secured his dogs outside; he entered his bedroom to obtain clothing; he sat in the living room; and he used his bathroom.

-10-

Given the extensive arsenal of weapons discovered inside Axsom's house, we find the absence of the second mitigating factor – unrestrained freedom of movement – much less significant than we otherwise would. Upon entering the residence, agents confronted immediate threats to their physical security – dogs, rifles and shotguns, a loaded handgun, a Samurai sword collection, and an extensive array of other guns and knives hanging from the walls. From an objective viewpoint, a reasonable person in Axsom's shoes should have realized the agents escorted him not to restrict his movement, but to protect themselves and the integrity of the search.

We further find the absence of any aggravating factors outlined in Griffin. While execution of the search warrant was certainly police-dominated,[4] the interview between the two agents and Axsom was not. The record contains no evidence of coercive or deceptive conduct by the agents during questioning. Axsom was not arrested after questioning. Finally, the record establishes no other aggravating circumstances.

In evaluating whether Axsom was "in custody," we are not concerned with any moral or psychological pressures causing Axsom to be forthright and helpful to the agents. Our examination only relates to the restraint imposed by the agents. Erving L., 147 F.3d at 1247. Under the relevant circumstances here, a reasonable person would have felt he was at liberty to terminate the interrogation and walk away or turn his back on the agents.

---

[4]Over a decade ago, we declared in United States v. Mottl that "[g]iven the FBI's acknowledged record of fairness toward criminal suspects, we see no reason why the agents elected not to read [the suspect] the Miranda warning." 946 F.2d at 1370-71. The same holds true for the present case. We again urge federal agents not to view our reversal as a "license to depart from that legacy of fairness." Id. at 1371.

-11-

**III. CONCLUSION**

Because Axsom was not in custody, he was not entitled to <u>Miranda</u> warnings. Conducting a <u>Thompson</u> independent review, we conclude the district court erred in suppressing the defendant's statements. We reverse the judgment of the district court and remand the case for further proceedings consistent with this opinion.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.