# United States Court of Appeals
## For the Eighth Circuit

_____

### No. 03-3471

_____

|  |  |  |
|---|---|---|
| | * | |
| United States of America, | * | Appeal from the United |
| | * | States District Court |
| Plaintiff - Appellee, | * | for the Northern |
| | * | District of Iowa |
| v. | * | |
| | * | [UNPUBLISHED] |
| | * | |
| Jesse James Hephner, | * | |
| | * | |
| Defendant - Appellant. | * | |
| | * | |

_____

Submitted: May 12, 2004
Filed: June 4, 2004

_____

Before BYE, HAMILTON[1], and HANSEN, Circuit Judges.

_____

PER CURIAM.

_____

[1]The Honorable Clyde H. Hamilton, United States Circuit Judge for the United States Court of Appeals for the Fourth Circuit, sitting by designation.

Jesse James Hephner (Hephner) appeals from a district court[2] judgment entered following his conditional guilty plea and sentencing to the charge of possessing cocaine and marijuana with the intent to distribute, and aiding and abetting the same, 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.  We affirm.

I

A

On April 3, 2002, Iowa State Patrol Troopers Christopher Adkins (Trooper Adkins) and Darin Snedden (Trooper Snedden) received information that a black 1997 Dodge Ram pickup truck with yellow racing stripes and Wisconsin license plates may be transporting cocaine from California to Wisconsin.  The troopers were told that the truck may have "add-on" equipment in violation of Iowa law, including excessively loud mufflers.

At around 10:00 a.m., the troopers positioned their patrol cars in the median of Interstate 80 near mile marker 221 in Iowa to monitor eastbound traffic.  While sitting in Trooper Adkins' car, the troopers saw a black Dodge Ram pickup truck with Wisconsin plates heading eastbound.  According to Trooper Adkins, the truck's muffler sounded noticeably louder than other vehicles passing them on the interstate.  In fact, even with the windows of his car closed, Trooper Adkins could hear the sound of the muffler over the background noise of his running car, the car's scanner, the car's radio, and his conversation with Trooper Snedden.  Because the truck had an excessively loud muffler, the troopers decided to effect a traffic stop.

Trooper Snedden got out of Trooper Adkins' patrol car and into his own car.  Trooper Adkins pursued the pickup truck and stopped it, approximately four miles

---

[2]The Honorable Linda R. Reade, United States District Judge for the United States District Court for the Northern District of Iowa.

from where the troopers had first seen the truck. Trooper Snedden arrived at the scene of the stop shortly thereafter.

Trooper Adkins approached the pickup truck's driver and owner, Shannon Kramarczyk (Kramarczyk). Kramarczyk was informed that he was stopped for having an excessively loud muffler and was asked to provide a driver's license and vehicle registration card. After Kramarczyk produced his driver's license, Trooper Adkins asked Kramarczyk to get out of the truck and enter his patrol car. Once inside Trooper Adkins' car, Kramarczyk was informed that he was going to be issued a warning ticket for having an excessively loud muffler. During his conversation with Trooper Adkins, Kramarczyk said that he and Hephner (his cousin) had been in Wyoming visiting a friend for Easter vacation. Kramarczyk was unsure of the name of the town in Wyoming and stated that he and Hephner were on their way back to Wisconsin.

Meanwhile, Trooper Snedden engaged in a casual conversation with Hephner, who was a passenger in the pickup truck. During this conversation, Hephner indicated that he was returning from a gambling trip to Reno, Nevada. At this point, Trooper Snedden asked Hephner to exit the truck and sit in his patrol car, and Hephner complied.

After the troopers briefly conferred, a search for proof of insurance and the pickup truck's registration card ensued. At about twelve minutes after the initial stop, Trooper Adkins indicated to Kramarczyk that a proof of insurance infraction would be added to the warning ticket. Fourteen minutes after the initial stop, Kramarczyk was given the warning ticket.

Immediately after issuing Kramarczyk the warning ticket, Trooper Adkins asked Kramarczyk if he had anything illegal in the pickup truck. Kramarczyk said that he did not. When asked whether it would be okay to search the truck,

Kramarczyk unequivocally consented to the search. Kramarczyk then signed a consent to search form and, approximately fifteen minutes after the initial stop, a search of the truck began.

At this time, Iowa State Trooper Jesse Hernandez, who had arrived at the scene shortly after the initial stop, began a search of the pickup truck with the assistance of his drug detection dog. The dog, Woody, was certified in the drug detection of marijuana, methamphetamine, cocaine, and heroin. Woody gave a positive indication for narcotics both inside and outside the truck.

After Woody alerted, the troopers decided to move the location of the search from the interstate to the Iowa Department of Transportation (DOT) shop in Oakdale, Iowa. The troopers considered this location, which was fifteen miles to the east, to be safer. While neither Hephner nor Kramarczyk were asked if they were willing to go to the DOT facility, Kramarczyk assisted the troopers in locating the pickup truck's keys and advised them not to take a hard turn as the tires might rub against the truck. Neither Hephner nor Kramarczyk objected to the change of location.

Trooper Adkins transported Kramarczyk and Trooper Snedden transported Hephner to the DOT facility. Neither Kramarczyk nor Hephner were handcuffed for the trip. Another Iowa State Trooper drove Kramarczyk's pickup truck.

While en route to the DOT facility, Trooper Adkins talked to Kramarczyk about the differences in the stories he and Hephner had given concerning the nature of their trip. Trooper Adkins testified that Kramarczyk became visibly nervous and said, "I don't know what you're going to find in there, but whatever you find, it's probably Jesse [Hephner's]."

En route to the DOT facility, Trooper Snedden and Hephner had a casual conversation regarding hunting, snowmobiling, and dogs. Upon arriving at the DOT

facility, Trooper Snedden asked Hephner if there was anything he wanted to tell him about what was in the pickup truck. Hephner asked Trooper Snedden about what exactly the drug detection dog detected. Trooper Snedden told Hephner that the dog gave a positive indication for narcotics during the preliminary search. At that time, Hephner pulled a contact lens case from the passenger door pocket of Trooper Snedden's patrol car. Hephner stated that it was his case, opened it, and showed Trooper Snedden what Hephner identified as cocaine. Hephner told Trooper Snedden that he had opened the case over all the areas the dog alerted on and may have spilled some cocaine in those areas.

At the DOT facility, the troopers continued searching the vehicle and Woody alerted on a big red toolbox in the bed of the pickup truck. Hephner stated that the toolbox was his and that he would have to look for the key. Trooper Snedden retrieved Hephner's black duffel bag which Hephner then searched. Hephner stated that he could not find the key and must have lost it in Reno.

A locksmith was called to unlock the toolbox. The toolbox was opened and found to contain tools, a welder's coat, approximately twenty pounds of marijuana, and about 483 grams of cocaine. Kramarczyk and Hephner then were arrested, advised of their rights pursuant to Miranda[3], and transported to the Johnson County jail. En route to the jail, Hephner asked Trooper Snedden what he had found in the toolbox. Trooper Snedden told Hephner that he believed narcotics were found.

At the Johnson County jail, Hephner signed a statement acknowledging that he had been advised of his Miranda rights. Hephner later asked to speak to, and made contact with, an attorney in California. Drug Enforcement Administration Agent Kevin Cavanaugh (Agent Cavanaugh) arrived while Hephner was on the phone. After the phone call, Agent Cavanaugh asked Hephner whether he wanted to make

---

[3]Miranda v. Arizona, 384 U.S. 436 (1966).

a controlled delivery of the drugs in Wisconsin. Agent Cavanaugh also told Hephner that Kramarczyk claimed to have no knowledge of any drugs in the truck. When asked if Kramarczyk was being honest, Hephner answered "yes." When Hephner indicated that he was not interested in talking to law enforcement or cooperating, the interview was terminated.

B

On April 15, 2002, a federal grand jury sitting in the Northern District of Iowa charged Hephner in a one-count indictment with possession of cocaine and marijuana with the intent to distribute, and aiding and abetting the same, 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. On both May 30 and June 4, 2002, Hephner filed a motion to suppress.

On June 24 and October 10, 2002, a United States Magistrate Judge held hearings on the motions to suppress. At one of the hearings, Larry Van Meter (Van Meter), the manager of a muffler shop, was called as a witness by the defense. Van Meter testified that he examined the muffler on Kramarczyk's pickup truck for leaks and exhaust noise. In Van Meter's personal opinion, the muffler was not excessively loud.

On January 21, 2003, the magistrate judge issued a report and recommendation (R&R) recommending that the motions to suppress be denied. On April 2, 2003, the district court held a hearing on the motions to suppress. On May 8, 2003, the district court adopted the findings of fact in the R&R and concluded that the motions to suppress should be granted in part and denied in part. In its order, the district court found: (1) the initial stop of the pickup truck was based upon probable cause of a traffic violation and therefore was constitutionally permissible; (2) the troopers did not exceed the permissible scope of the stop; and (3) the length of the stop was no longer than necessary to effectuate the purpose of the stop. The court also found that

the positive indication by Woody provided probable cause to search every part of the truck and its contents.

In its order, the district court identified six statements made by Hephner: (1) a statement unrelated to the traffic stop; (2) a statement regarding traveling to Reno and losing money after losing his job; (3) statements made en route to the DOT facility offering a possible explanation as to why the drug detection dog may have alerted to areas in the pickup truck; (4) statements claiming ownership of the toolbox and losing a key in Reno; (5) the inquiry into what Trooper Snedden had found in the toolbox, which was made after Hephner was arrested and advised of his <u>Miranda</u> rights; and (6) the statement, made after Hephner was arrested and advised of his <u>Miranda</u> rights, indicating that a statement made by Kramarczyk was truthful.

The district court held that Hephner was not in custody when the first four statements were made and the statements therefore were admissible. The district court stated that Hephner did not appear to challenge the admissibility of the fifth statement. Finally, the district court found that Agent Cavanaugh initiated further questioning after Hephner invoked his right to counsel and suppressed the sixth statement.

On May 27, 2003, Hephner entered a conditional plea of guilty before the magistrate judge, reserving the right to appeal the denial of his motions to suppress. On the same day, the magistrate judge recommended that the conditional plea of guilty be accepted. On June 2, 2003, the district court accepted the conditional plea of guilty. On September 25, 2003, the district court sentenced Hephner to 51 months' imprisonment. Hephner noted a timely appeal.

II

Hephner argues that the district court erred when it refused to suppress the evidence found during the search of the pickup truck and when it refused to suppress

certain statements he made to the law enforcement officers. We review the denial of a motion to suppress de novo, but review underlying factual determinations for clear error, giving due weight to the inferences of the district court and law enforcement officers. United States v. Wheat, 278 F.3d 722, 725-26 (8th Cir. 2001), cert. denied, 537 U.S. 850 (2002). We will affirm the denial of a suppression motion "unless we find that the decision is unsupported by the evidence, based on an erroneous view of the law, or the Court is left with a firm conviction that a mistake has been made." United States v. Madrid, 152 F.3d 1034, 1037 (8th Cir. 1998) (citation and internal quotation marks omitted).

A

Hephner first challenges the validity of the initial stop. His argument boils down to an attack on the district court's conclusion that the troopers had probable cause to stop the pickup truck for having an excessively loud muffler.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Because the temporary detention of an individual during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a seizure of an individual within the meaning of the Fourth Amendment, Delaware v. Prouse, 440 U.S. 648, 653 (1979), the temporary detention must be reasonable to survive constitutional scrutiny. Whren v. United States, 517 U.S. 806, 810 (1996). A traffic stop based on probable cause is reasonable under the Fourth Amendment. Id. at 819. Thus, it is well settled that "[a]ny traffic violation, however minor, provides probable cause for a traffic stop." United States v. Bloomfield, 40 F.3d 910, 915 (8th Cir. 1994).

In advancing his argument, Hephner essentially concedes, as he must, that if the troopers had probable cause to stop the pickup truck for an excessively loud muffler, his challenge to the initial stop fails. Cf. Iowa Code § 321.436 ("Every

motor vehicle shall at all times be equipped with a muffler in good working order and in constant operation to prevent excessive or unusual noise.").

In this case, the district court credited the testimony of the troopers concerning how loud the pickup truck's muffler sounded as it passed the troopers on Interstate 80. The evidence presented by the government demonstrated that, even with the windows of his patrol car closed, Trooper Adkins could hear the sound of the muffler over the background noise of his running car, the car's scanner, the car's radio, and his conversation with Trooper Snedden. While this evidence was slightly undermined by Van Meter's testimony, the district court obviously was at liberty to credit the testimony of the witnesses it found more credible, in this case the testimony of the troopers. United States v. Heath, 58 F.3d 1271, 1275 (8th Cir.1995) ("A district court's determination as to the credibility of a witness is virtually unreviewable on appeal.").

Hephner also challenges most of the troopers' actions after the initial stop, focusing primarily on the decision to move the pickup truck to the DOT facility and the overall length of the stop. We find that the troopers acted within the boundaries mandated by the Constitution.

Once Kramarczyk voluntarily consented to a search of the pickup truck, the troopers were entitled to initiate a search with the help of Woody. United States v. White, 42 F.3d 457, 459 (8th Cir. 1994) ("A consensual search does not violate the Fourth Amendment if the consent was voluntarily given without coercion."). Once Woody alerted both inside and outside the truck, the troopers had probable cause to search the truck, United States v. Sundby, 186 F.3d 873, 876 (8th Cir. 1999) ("A dog's positive indication alone is enough to establish probable cause for the presence of a controlled substance if the dog is reliable."), including all of its contents. United States v. Ross, 456 U.S. 798, 825 (1982) ("If probable cause justifies the search of a

lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search.").[4]

After Woody alerted, the decision was made to move the pickup truck to the DOT facility. Unquestionably, this decision did not run afoul of the Fourth Amendment. See, e.g., United States v. Gonzalez, 328 F.3d 755, 759 (5th Cir. 2003) (holding that the movement of the defendant's vehicle from Interstate 20 to Louisiana State Patrol headquarters was permissible because the "officers clearly had probable cause to move the vehicle in order to conduct a more complete search once Lika the narcotics dog gave a positive alert to the presence of narcotics in the area of the rear wheel well and undercarriage."). Finally, once the truck was moved to the DOT facility, the troopers diligently proceeded with the search of the truck, in an effort to confirm the findings of Woody. Because the troopers were diligent in pursuing reasonable lines of investigation, including taking the reasonable step to call a locksmith to open the toolbox in a manner that would preserve its structural integrity and result only in an insignificant delay, we cannot take issue with the length of the stop in this case. Cf. United States v. Sharpe, 470 U.S. 675, 686 (1985) ("In assessing whether a detention is too long in duration to be justified as an investigative stop, it is appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.").

In sum, the district court did not err when it refused to suppress the evidence found during the search of the pickup truck.

---

[4]Because the troopers had probable cause to search the pickup truck and its contents, the issue concerning the scope of Kramarczyk's consent, i.e., whether it extended to permit the search of the toolbox which was owned by Hephner, became irrelevant. Cf. United States v. Brown, 345 F.3d 574, 581 (8th Cir. 2003) ("Once the officers discovered the false ceiling and the drug dog alerted to the false ceiling, any quarrel regarding consent and its scope was irrelevant.").

B

Hephner also argues that the district court erred when it refused to suppress the third, fourth, and fifth statements he made to the law enforcement officers. Hephner's third statement involved statements made by him en route to the DOT facility; these statements offered a possible explanation as to why the drug detection dog may have alerted to certain areas in the pickup truck. Hephner's fourth statement involved statements made by him claiming ownership of the toolbox and losing a key in Reno. Hephner's fifth statement involved his self-initiated inquiry concerning what the drug detection dog found in the truck.

Under Miranda, an individual must be warned about the rights encompassed in the privilege against self-incrimination if he is taken into "custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning." Miranda, 384 U.S. at 478-79; see also United States v. Wallace, 323 F.3d 1109, 1112 (8th Cir. 2003). Accordingly, before the procedural safeguards of Miranda attach, the defendant must be in custody and interrogated. Miranda, 384 U.S. at 444, 478-79.

"[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Stansbury v. California, 511 U.S. 318, 323 (1994). Further, "we must examine both the presence and extent of physical and psychological restraints placed upon the person's liberty during the interrogation in light of whether a reasonable person in the suspect's position would have understood his situation to be one of custody." United States v. Axsom, 289 F.3d 496, 500 (8th Cir. 2002) (citation and internal quotation marks omitted).

To do this, we have developed a list of six common, but non-exhaustive, indicia to determine whether an individual is in custody:

(1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

Id. In applying these indicia, we employ a balancing test. Id. at 500-01. "The first three indicia are mitigating factors which, if present, mitigate against the existence of custody at the time of questioning. Conversely, the last three indicia are aggravating factors which, if present, aggravate the existence of custody." Id.

This court has repeatedly held that a voluntary statement made by a suspect, not in response to interrogation, is not barred by the Fifth Amendment and is admissible with or without the giving of Miranda warnings. See, e.g., United States v. Hatten, 68 F.3d 257, 262 (8th Cir. 1995). Determining whether particular statements or practices amount to interrogation depends on the circumstances of each case, particularly whether the statements are objectively and reasonably likely to result in incriminating responses by the suspect, as well as the nature of the police statements and the context in which they are given. Rhode Island v. Innis, 446 U.S. 291, 300-02 (1980). Moreover, our focus is on Hephner's perceptions of the behavior of the law enforcement officers at the time the conversations took place. Boykin v. Leapley, 28 F.3d 788, 792 (8th Cir. 1994).

With regard to Hephner's third statement, he has failed to prove he was in custody or interrogated at that time. No strong arm tactics were employed and the atmosphere was not police dominated. Hephner and Trooper Snedden had a conversation unrelated to the stop regarding hunting, snowmobiling, and dogs.

Hephner was not in handcuffs and he was not arrested at that time. Simply put, Hephner voluntarily told Trooper Snedden, without prompting, why the drug detection dog may have alerted to the presence of narcotics in the pickup truck and voluntarily produced a contact lens case which he indicated contained cocaine.

With regard to the fourth statement, Hephner voluntarily stated that he owned the toolbox and voluntarily attempted to locate the key. Again, Hephner was not in handcuffs when this statement was made and not arrested at that time. Moreover, at the time the statement was made, the atmosphere was not police dominated. Thus, it is difficult to see how it can be said that Hephner was in custody or being interrogated at this time.

Finally, in a footnote, Hephner challenges the admissibility of his fifth statement, which was his self-initiated inquiry, made after he was arrested and advised of his Miranda rights, concerning what Trooper Snedden found in the toolbox. Notwithstanding Hephner's apparent failure to object to this portion of the magistrate judge's R&R, the statement obviously is admissible; it was initiated by Hephner and was not made in response to a law enforcement inquiry. Accordingly, Hephner was not being "interrogated" at the time the fifth statement was made.

### III

For the reasons stated herein, the judgment of the district court is affirmed.

---