Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
05/01/2018 09:10 AM CDT

STATE OF NEBRASKA, APPELLEE, V.
GILBERTO ZUNIGA, APPELLANT.
___ N.W.2d ___

Filed April 3, 2018.    No. A-17-226.

1. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error. But whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.

2. **Constitutional Law: Confessions: Miranda Rights: Motions to Suppress: Appeal and Error.** In reviewing a motion to suppress a statement based on its claimed involuntariness, including claims that law enforcement procured it by violating the safeguards established by the U.S. Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error. But whether those facts meet constitutional standards is a question of law, which an appellate court reviews independently of the trial court's determination.

3. **Constitutional Law: Search and Seizure.** It is well settled under the Fourth Amendment that warrantless searches and seizures are per se unreasonable, subject to a few specifically established and well-delineated exceptions.

4. **Warrantless Searches.** The warrantless search exceptions recognized by the Nebraska Supreme Court include: (1) searches undertaken with consent, (2) searches under exigent circumstances, (3) inventory searches, (4) searches of evidence in plain view, and (5) searches incident to a valid arrest.

5. **Constitutional Law: Search and Seizure: Duress.** To be effective under the Fourth Amendment, consent to a search must be a free and unconstrained choice and not the result of a will overborne. Consent must be given voluntarily and not as the result of duress or coercion, whether express, implied, physical, or psychological.

6. **Search and Seizure: Duress.** In determining whether consent was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents.

7. **Constitutional Law: Search and Seizure.** The Fourth Amendment test for a valid consent to search is that the consent be voluntary, and voluntariness is a question of fact to be determined from the totality of the circumstances.

8. **Constitutional Law: Miranda Rights: Self-Incrimination.** *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), prohibits the use of statements stemming from the custodial interrogation of a defendant unless the prosecution demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.

9. **Miranda Rights.** *Miranda* protections apply only when a person is both in custody and subject to interrogation.

10. **Miranda Rights: Arrests: Words and Phrases.** A person is in custody for purposes of *Miranda v. Arizona*, 484 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), when there is a formal arrest or a restraint on one's freedom of movement to the degree associated with such an arrest.

11. **Miranda Rights.** Two inquiries are essential to the determination of whether an individual is in custody for *Miranda* purposes: (1) an assessment of the circumstances surrounding the interrogation and (2) whether, given those circumstances, a reasonable person would have felt that he or she was not at liberty to terminate the interrogation and leave.

Appeal from the District Court for Lancaster County: Darla S. Ideus, Judge. Affirmed.

Thomas R. Lamb and Hannah E. Carroll-Altman, Senior Certified Law Student, of Anderson, Creager & Wittstruck, P.C., L.L.O., for appellant.

Douglas J. Peterson, Attorney General, and Siobhan E. Duffy for appellee.

Pirtle, Bishop, and Arterburn, Judges.

Arterburn, Judge.

## INTRODUCTION

After a bench trial in the district court for Lancaster County, Gilberto Zuniga was convicted of one count of delivery or possession with intent to deliver methamphetamine. On appeal, he challenges the district court's order overruling his motion to suppress evidence obtained during a warrantless search of his apartment and his motion to suppress statements he made to police at the time of the search. For the following reasons, we affirm.

## BACKGROUND

On August 1, 2016, the State filed an amended information charging Zuniga with delivery or possession with intent to deliver methamphetamine, a Class II felony. Prior to trial, Zuniga filed a motion to suppress the evidence obtained during a warrantless search of his apartment. He alleged that the search did not fall under any recognized exception to the warrant requirement because he did not validly consent to the search nor was there probable cause to justify the search. In his motion to suppress, Zuniga also asked that the statements he made to police at the time of the search be suppressed. He alleged that the statements resulted from custodial interrogation that occurred before he was advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

The district court held a suppression hearing. At the hearing, Zuniga argued to the district court that he did not validly consent to a search of his apartment. Zuniga argued that law enforcement officers induced his consent by leading him "to believe that if he led them inside of the apartment, [and gave] them the drugs that nothing would happen." The State called the three law enforcement officers who were present during the search of Zuniga's apartment to testify that Zuniga's consent to search was, in fact, valid.

Officer Robert Hallowell testified first. He was assigned as an investigator with a narcotics task force. On May 20, 2015, he and Officers Anthony Gratz and Christopher Monico were involved in an investigation at the apartment building where Zuniga lived. The officers had received information that Zuniga was selling narcotics out of the apartment building; however, they were unsure of the exact apartment Zuniga lived in.

At around 8:45 p.m. on May 20, 2015, the officers arrived at Zuniga's apartment building. All three were wearing plain clothes, but they each had a lanyard around their neck with their badge displayed. Officer Hallowell testified that after they arrived at Zuniga's apartment building, Officer Gratz placed a telephone call to Zuniga and told him that his vehicle had been involved in "a hit and run." Officer Gratz asked Zuniga to come outside and speak with police about his vehicle. Officer Hallowell admitted that the substance of the telephone call was a "ruse" in order to get Zuniga to come outside. Officer Hallowell also testified that the ruse was successful and that Zuniga came outside to check on his vehicle.

When Zuniga approached his vehicle, the officers explained why they were actually there. Specifically, Officer Hallowell testified that they informed Zuniga that they had information he was in possession of a large quantity of methamphetamine for the purpose of selling it. In fact, they told Zuniga that they knew where in his apartment the drugs were located. The officers indicated that they wanted Zuniga to turn the drugs over to them. Officer Hallowell testified that he did recall that Officer Gratz told Zuniga his goal was to make sure drugs were not going to be sold out of Zuniga's apartment anymore. Zuniga did not deny possessing the drugs.

Officer Hallowell testified that he did not participate much in the portion of the conversation with Zuniga that occurred next to Zuniga's vehicle. Instead, he stood "a little bit further away," so that Zuniga would not feel surrounded. However, Officer Hallowell testified that Zuniga did indicate to the

officers that he wanted to be honest with them. Zuniga also told them about a prior incident with police where he felt like he had been "set up." Officer Hallowell described a "back and forth" between the officers and Zuniga about whether they could enter his apartment. After about 30 minutes, Zuniga led officers into his apartment.

Once inside the apartment, Officer Hallowell joined Officer Gratz in continuing to speak with Zuniga about there being drugs in the apartment. The two officers asked Zuniga two or three times whether he would allow them to look inside a drawer located next to the sink in his kitchen. Officer Hallowell testified that Zuniga continued to talk about his prior experience with police and about his desire to be honest. After about 10 to 15 minutes of conversation inside the apartment, Zuniga agreed to allow officers to look in the kitchen drawer. Inside the drawer was a clear plastic baggie which contained a white crystalline substance resembling methamphetamine and a black digital scale. Subsequent to the search of the drawer, Zuniga was arrested. Officer Hallowell testified that up to the point in time when Zuniga was formally arrested, he was never told that he could not leave, nor did he ever ask to leave or try to leave.

At the jail, Officer Hallowell advised Zuniga of his *Miranda* rights and then proceeded to ask him about the drugs found in his apartment. During this interview, Zuniga revealed to Officer Hallowell where he had obtained the methamphetamine and revealed that he had been selling methamphetamine for approximately 4 months and had between 5 and 10 regular customers.

Officer Gratz also testified about the events which occurred on May 20, 2015. Officer Gratz testified that he placed a telephone call to Zuniga from outside his apartment building "in hopes that he would come out so we could have a conversation with him." During the telephone call, Officer Gratz told Zuniga that he was a police officer and that Zuniga's vehicle may have been involved in an accident. At first, Zuniga told

Officer Gratz that his vehicle was equipped with a loud alarm and that he would have heard the alarm if his vehicle had been struck by another vehicle. Eventually, though, Zuniga agreed to come outside.

After Zuniga came outside and approached his vehicle, the officers informed him that they were narcotics investigators and that they actually wanted to talk with him about his involvement with using and selling drugs from his apartment. Officer Gratz testified that once Zuniga knew why the officers were actually there, he became nervous and looked down and away from the officers. His breathing became rapid. Zuniga began talking about his previous involvement with law enforcement. He indicated his belief that he had been previously "set up" by an informant and law enforcement and was, as a result, arrested with a large quantity of narcotics. Officer Gratz testified that he asked Zuniga two or three times if they could continue their conversation inside his apartment because it was cold outside. Zuniga "eventually" said he was "okay with that" and led the officers into his apartment. Officer Gratz testified that the conversation with Zuniga outside of his apartment building lasted approximately 30 to 45 minutes.

Once inside the apartment, the officers and Zuniga "had [a] lengthy period of casual conversation about things other than drugs" which lasted approximately 5 or 10 minutes. Then, Zuniga sat down in a chair and Officer Gratz asked him if he was going to be honest. Officer Gratz testified that he told Zuniga that the officers wanted this to be "the last day that drugs were being used or sold" in the apartment. Zuniga agreed that "things needed to change." He then transitioned into talking about his prior arrest again. Zuniga told Officer Gratz that he did not want to go back to prison. Officer Gratz testified that he told Zuniga that it was not his goal to send Zuniga to prison. Instead, his goal was to stop the selling of drugs out of Zuniga's apartment. Officer Gratz testified that he never promised Zuniga he would not go to prison if he cooperated.

After 15 to 20 minutes of conversation inside the apartment, Officer Gratz asked Zuniga if he could look in two kitchen drawers where he believed the drugs were located. Officer Gratz testified that after a lengthy pause, Zuniga consented to officers' looking in the drawers. Upon searching one of the drawers, officers found a baggie containing what Officer Gratz believed to be methamphetamine and a digital scale. Subsequent to the search of the drawer, Zuniga was arrested. Officer Gratz testified that about 45 minutes passed between the officers' entering Zuniga's apartment and placing him under arrest.

Officer Monico testified similarly about the events of May 20, 2015. Officer Monico testified that when Zuniga came outside to inspect his vehicle, the officers contacted him and identified themselves as officers with the narcotics task force. They told Zuniga they wanted to talk to him about him selling methamphetamine from his apartment. Officer Monico testified that once officers revealed the actual reason they were contacting Zuniga, his "level of nervousness was visibly apparent and rose." Officer Monico stated, "I remember specifically he put a hand up on his car and leaned over on it and hung his head and began staring at the ground." Zuniga then told the officers about a prior situation in which he had been arrested on drug charges. Specifically, Zuniga felt he had been "wronged" on this previous occasion when he had let law enforcement into his home and they began searching everywhere. Zuniga told Officers Hallowell, Gratz, and Monico that he wanted to be honest with them, but he was afraid he would go to prison. Officer Monico testified that Zuniga indicated that he did have drugs in his apartment, but he was "hesitant to say exactly how much."

Officer Monico testified that he and the other officers asked Zuniga multiple times if they could go inside his apartment to continue their conversation because it was cold outside. Eventually, after "[a]t least a half hour," Zuniga agreed to let the officers inside. He escorted the officers to the apartment

door, opened the door, and allowed the officers to follow him inside.

Once inside the apartment, Officer Monico overheard Officer Gratz tell Zuniga that he believed the methamphetamine was in a particular drawer in the kitchen. Officer Monico also overheard Zuniga express concern and fear about going to prison. Officer Gratz responded that sending Zuniga to prison was not his goal. Sometime after this exchange, Zuniga gave officers permission to search the kitchen drawer. Inside the drawer was a baggie with what Officer Monico believed to be methamphetamine and a digital scale. Subsequent to the search of the drawer, Zuniga was placed under arrest. Officer Monico testified that officers spent a total of approximately 45 to 50 minutes inside Zuniga's apartment.

We note that Zuniga did not testify at the suppression hearing, nor did he present any other evidence.

In a written order, the district court denied Zuniga's motion to suppress evidence and motion to suppress statements. Regarding the motion to suppress evidence, the court stated, "Having considered the totality of the circumstances . . . the court concludes [Zuniga's] consent to search was given freely, intelligently, and voluntarily." In coming to this conclusion, the district court made the following factual findings:

In this case, [Zuniga's] age is not readily apparent from the record, but he physically appears older than 30 years of age. There is no evidence [Zuniga] suffers from any mental impairment. There is no evidence he was under the influence of drugs or alcohol during his discussion with Investigators. [Zuniga] was not informed of his *Miranda* rights prior to his consent to search. [Zuniga] has had prior involvement with law enforcement and the criminal justice system. [Zuniga] was outside with investigators for 30-45 minutes after which he consented to Investigators entering his apartment. Investigators were then inside the apartment for 10-20 minutes before [Zuniga] gave consent to search. The request for consent

was made 2-3 times before it was given. There were no threats, physical intimidation or punishment used to obtain consent. No promises were made by Investigators but statements were made that it was not the goal to arrest [Zuniga]. Consent was given inside [Zuniga's] apartment in "familiar surroundings". At no time during the discussions did [Zuniga] ask to leave nor did he ask Investigators to leave. [Zuniga] was not told he could not leave, and [he] did not ask for counsel.

Regarding the motion to suppress statements, the court found that Zuniga was not in custody at the time of the search of his apartment. As such, law enforcement was not required to inform him of his *Miranda* rights.

The matter proceeded to a stipulated bench trial. The State introduced an exhibit which contained police reports, property reports of the items seized during the search, and a laboratory report showing that the substance seized from the drawer in Zuniga's kitchen tested positive for methamphetamine. Zuniga objected to the exhibit based on the arguments raised in his motion to suppress, and the court overruled the objection. Zuniga then introduced into evidence various exhibits, including the deposition testimony of Officers Hallowell, Gratz, and Monico. The district court found Zuniga guilty of delivery or possession with intent to deliver methamphetamine. Subsequently, the court sentenced Zuniga to 8 to 12 years' imprisonment.

Zuniga appeals.

## ASSIGNMENTS OF ERROR

Zuniga asserts that the district court erred in overruling his motion to suppress the evidence obtained during the search of his apartment and his motion to suppress the statements he made to police at the time of the search.

## STANDARD OF REVIEW

[1] In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment,

we apply a two-part standard of review. *State v. Wells*, 290 Neb. 186, 859 N.W.2d 316 (2015). Regarding historical facts, we review the trial court's findings for clear error. *Id.* But whether those facts trigger or violate Fourth Amendment protections is a question of law that we review independently of the trial court's determination. *Id.*

[2] In reviewing a motion to suppress a statement based on its claimed involuntariness, including claims that law enforcement procured it by violating the safeguards established by the U.S. Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), we apply a two-part standard of review. *State v. DeJong*, 287 Neb. 864, 845 N.W.2d 858 (2014). Regarding historical facts, we review the trial court's findings for clear error. *Id.* Whether those facts meet constitutional standards, however, is a question of law, which we review independently of the trial court's determination. *Id.*

## ANALYSIS

*Motion to Suppress Evidence.*

Zuniga maintains that it was error to overrule his motion to suppress evidence obtained during the warrantless search of his apartment. He argues that he did not freely and voluntarily consent to officers' looking inside his kitchen drawer. Rather, Zuniga contends that his "consent was the result of coercion, and based upon lies by police." Brief for appellant at 9. He asserts that the officers lied to him in order to get him to come outside of his apartment and lied to him again when they told him he would not go to prison if he cooperated and turned over the drugs.

[3,4] It is well settled under the Fourth Amendment that warrantless searches and seizures are per se unreasonable, subject to a few specifically established and well-delineated exceptions. *State v. Tucker*, 262 Neb. 940, 636 N.W.2d 853 (2001). The warrantless search exceptions recognized by the Nebraska Supreme Court include: (1) searches undertaken with consent, (2) searches under exigent circumstances,

(3) inventory searches, (4) searches of evidence in plain view, and (5) searches incident to a valid arrest. *Wells, supra.*

[5-7] To be effective under the Fourth Amendment, consent to a search must be a free and unconstrained choice and not the result of a will overborne. *Tucker, supra.* Consent must be given voluntarily and not as the result of duress or coercion, whether express, implied, physical, or psychological. *Id.* In determining whether consent was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents. See *State v. Prahin*, 235 Neb. 409, 455 N.W.2d 554 (1990). Mere submission to authority is insufficient to establish consent to search. *Tucker, supra.* The Fourth Amendment test for a valid consent to search is that the consent be voluntary, and voluntariness is a question of fact to be determined from the totality of the circumstances. *State v. Ready*, 252 Neb. 816, 565 N.W.2d 728 (1997). The burden is on the State to prove that consent to search was voluntarily given. *Prahin, supra.*

Based on the evidence presented at the suppression hearing, the district court's finding that Zuniga's consent to search the drawer was given freely, intelligently, and voluntarily was not clearly erroneous. As such, we affirm the denial of Zuniga's motion to suppress the evidence found in the drawer.

While we agree with Zuniga's general assertion that the police used deception in order to get him to come outside of his apartment, we do not find that such deception invalidated Zuniga's subsequent consent to search the kitchen drawer. The Nebraska Supreme Court has held that police deception which is not coercive in nature will not invalidate an individual's consent to search if the record otherwise shows the consent was voluntary. *State v. Hedgcock*, 277 Neb. 805, 765 N.W.2d 469 (2009).

Officer Hallowell admitted during his testimony that he and Officers Gratz and Monico used a ruse in order to get Zuniga to come outside of his apartment building so they could speak with him. However, once Zuniga was outside,

the officers immediately told him of the real reason they were there. They informed Zuniga that they had information he was using and selling drugs out of his apartment and that they wanted him to turn the drugs over to them. After the officers revealed their deception to Zuniga, he did not tell them to leave nor did he ever indicate he did not want to talk to them. In fact, he told the officers that he wanted to be honest with them about the drugs. And, after approximately 30 to 45 minutes of conversation with the officers outside of Zuniga's apartment building, he agreed to allow the officers inside of his apartment. Ultimately, the evidence presented at the suppression hearing reveals that the initial deception used by the officers was quickly corrected upon the officers' contacting Zuniga near his vehicle. Accordingly, we do not find that this deception was coercive in nature or that it invalidated either Zuniga's consent to enter his apartment or his ultimate consent to search his kitchen drawer.

We do not agree with Zuniga's assertion that the police deceived him again by telling him he would not be arrested if he cooperated and turned over the drugs in his apartment. In fact, in its order, the district court found that Officer Gratz had specifically testified that he did not promise Zuniga that he would not go to prison if he cooperated. The district court found this testimony to be credible, and we recognize that the district court was the finder of fact and take into consideration that it observed the witnesses. See *Ready, supra*. We do find, as did the district court, that Officer Gratz indicated to Zuniga that it was not his goal to arrest him, but that it was his goal to remove the drugs from the apartment. This statement comes close to being a misrepresentation or a promise not to arrest. However, in this case, in light of the other factors surrounding Zuniga's consent to search the drawer, we do not find that Officer Gratz' statement was enough to cause Zuniga's will to be overborne or to invalidate the consent.

Of particular importance in our analysis of the voluntariness of Zuniga's consent is his prior experience with law

enforcement. Zuniga repeatedly told the officers involved in
this case that he had been previously arrested as a result of
his possession of a large quantity of drugs. He informed the
officers that he felt he had been treated unfairly at the time
of this previous arrest, in part because he felt police had
searched his home without his full consent. Given Zuniga's
past experience, he clearly understood the effect of his giv-
ing consent to search the kitchen drawer. In addition, he
understood the effect of his being in possession of drugs.
Moreover, there was no evidence presented at the suppression
hearing that Zuniga's interactions with the officers included
threats, physical intimidation, or punishment. According to
the officers' testimony, one officer typically stayed away from
the immediate vicinity of the conversation, whether inside
the apartment or outside in the parking lot, so as not to sur-
round Zuniga. The evidence reveals that the officers had a
calm and professional conversation with Zuniga about his use
and selling of drugs from his apartment. During the interac-
tion, which lasted approximately an hour or less, Zuniga
never asked the officers to leave, never tried to leave himself,
and never indicated that he no longer wanted to speak with
the officers.

Given the totality of the circumstances present in this case,
the district court's finding that Zuniga's consent to search the
drawer was given freely, intelligently, and voluntarily was not
clearly erroneous. However, we note that under a different set
of facts, Officer Gratz' statement that it was not his goal to
arrest or imprison someone could lead to a different result. We
leave that determination for another case.

*Motion to Suppress Statements.*

Zuniga argues that the district court erred in overruling his
motion to suppress the statements he made to police before
and during the search of the drawer. He asserts that the state-
ments he made were the result of a custodial interrogation and
that he was not, at that time, advised of his rights pursuant to

*Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[8-11] *Miranda, supra*, prohibits the use of statements stemming from the custodial interrogation of a defendant unless the prosecution demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. *State v. McKinney*, 273 Neb. 346, 730 N.W.2d 74 (2007). *Miranda* protections apply only when a person is both in custody and subject to interrogation. *State v. Juranek*, 287 Neb. 846, 844 N.W.2d 791 (2014). A person is in custody for purposes of *Miranda* when there is a formal arrest or a restraint on one's freedom of movement to the degree associated with such an arrest. *State v. Landis*, 281 Neb. 139, 794 N.W.2d 151 (2011). Two inquiries are essential to this determination: (1) an assessment of the circumstances surrounding the interrogation and (2) whether, given those circumstances, a reasonable person would have felt that he or she was not at liberty to terminate the interrogation and leave. *State v. Rogers*, 277 Neb. 37, 760 N.W.2d 35 (2009).

The Nebraska Supreme Court, quoting *U.S. v. Axsom*, 289 F.3d 496 (8th Cir. 2002), has applied "'six common indicia of custody which tend either to mitigate or aggravate the atmosphere of custodial interrogation.'" *State v. Mata*, 266 Neb. 668, 682, 668 N.W.2d 448, 466 (2003), *abrogated on other grounds, Rogers, supra*. Those indicia are as follows: (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong-arm tactics or deceptive stratagems were used during questioning; (5) whether the atmosphere of the questioning was police dominated; and (6) whether the

suspect was placed under arrest at the termination of the proceeding. See *id*.

The Nebraska Supreme Court has also identified other circumstances relevant to the custody inquiry: (1) the location of the interrogation and whether it was a place where the defendant would normally feel free to leave; (2) whether the contact with the police was initiated by them or by the person interrogated, and, if by the police, whether the defendant voluntarily agreed to the interview; (3) whether the defendant was told he or she was free to terminate the interview and leave at any time; (4) whether there were restrictions on the defendant's freedom of movement during the interrogation; (5) whether neutral parties were present at any time during the interrogation; (6) the duration of the interrogation; (7) whether the police verbally dominated the questioning, were aggressive, were confrontational, were accusatory, threatened the defendant, or used other interrogation techniques to pressure the suspect; and (8) whether the police manifested to the defendant a belief that the defendant was culpable and that they had the evidence to prove it. *Rogers, supra*.

Upon our review, we conclude that the district court's finding that Zuniga was not in custody at the time he made the statements was not clearly erroneous. We recognize that some of the circumstances surrounding the making of the statements could tend to support a finding that Zuniga was in custody. For example, contact with Zuniga was initiated by the officers and Zuniga was never told he was free to terminate the interaction with the officers. In addition, the officers clearly informed Zuniga that they knew he was in possession of drugs and, in fact, knew where in his apartment he kept those drugs. Zuniga was arrested after the drugs were located by the officers.

However, the evidence which supports the district court's finding overcomes the foregoing factors. Zuniga was first located in the parking lot of his apartment building and then was in his own apartment. He was not at the police station or

in an unfamiliar environment. The officers did not physically restrain Zuniga or in any way impede his movement. There is no indication that Zuniga was not free to ask the officers to leave and terminate the interview. There was no evidence that the officers used threats, physical intimidation, or punishment to coerce Zuniga into speaking with them. As we stated above, the evidence demonstrated that the interaction between Zuniga and the officers was consensual and that Zuniga was cooperative. Zuniga spoke with officers freely and never denied his possession of drugs. There was no intensive or high pressure interrogation of Zuniga. In fact, Officer Gratz testified that once Zuniga and the officers entered Zuniga's apartment, they all engaged in a "casual conversation" about things other than drugs. According to the evidence, more than one such interlude occurred during the course of the interview. Finally, we must reiterate that the evidence was clear that Zuniga was not a novice in dealing with law enforcement and repeatedly expressed a level of distrust regarding their intentions. Nonetheless, he ultimately agreed to talk with them.

In light of all the surrounding circumstances, we conclude that the district court's finding that Zuniga was not in custody is not clearly erroneous.

## CONCLUSION

For the reasons stated above, we affirm the decision of the district court to overrule both Zuniga's motion to suppress evidence and motion to suppress statements. We, therefore, affirm Zuniga's conviction.

Affirmed.