Filed 10/27/15  P. v. Hennig CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Siskiyou)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RONALD THOMAS HENNIG,<br><br>    Defendant and Appellant. | C071088<br><br>(Super. Ct. No. MCYKCRF070002229002) |

Law enforcement officers executed a search warrant on defendant Ronald Thomas Hennig's ranch and seized 14 to 15 pounds of marijuana buds, 19 pounds of leafy marijuana material, 188 marijuana plants, four firearms, and suspected concentrated cannabis and psilocybin mushrooms.  A jury convicted defendant of illegally cultivating marijuana, possessing marijuana for sale, and theft of utility services.  The trial court placed defendant on formal probation for five years with 365 days in jail.

Defendant now contends (1) the trial court erred in failing to instruct the jury on the Compassionate Use Act (CUA) in connection with the charge of possession of marijuana for sale; (2) the trial court defined marijuana too narrowly in connection with the count for illegally cultivating marijuana; (3) the trial court erred in excluding

1

evidence about whether a patient can stockpile a two-year supply of marijuana; (4) the trial court erred in excluding a defense expert's testimony about the average marijuana dosage prescribed by California doctors; (5) there is no substantial evidence that law enforcement witnesses had expertise in differentiating between persons who possess marijuana for personal medical needs and those who possess marijuana for sale; (6) a sheriff's deputy should not have been allowed to testify about the provisions of the CUA and the Medical Marijuana Program Act (MMPA), and defendant's trial counsel was incompetent for failing to object; (7) the prosecutor committed misconduct by eliciting improper testimony and misstating the law; (8) defendant's trial counsel was ineffective in other respects; (9) the trial court erred in admitting defendant's statements to a law enforcement officer in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694] (*Miranda*); and (10) the cumulative effect of the errors prejudiced defendant.

We conclude (1) the trial court correctly instructed the jury that it may not convict defendant of possessing marijuana for sale if defendant possessed marijuana for personal medical purposes; (2) the instructional error regarding the definition of marijuana did not prejudice defendant; (3) the trial court did not abuse its discretion in excluding evidence regarding hypothetical stockpiling of marijuana; (4) the trial court did not abuse its discretion in limiting expert testimony about typical practice by doctors; (5) defendant forfeited his challenge to law enforcement witness expertise by not objecting at trial; (6) defendant forfeited his challenge to the testimony about the CUA and the MMPA because he did not object in trial court, and he has not established ineffective assistance; (7) defendant also forfeited his claims of prosecutorial misconduct and failed to establish related ineffective assistance claims; (8) defendant has not shown that his trial counsel's representation was deficient or that the deficiency resulted in prejudice; (9) *Miranda* warnings were not required because defendant was not in custody when he answered the officer's questions; and (10) defendant's claim of cumulative prejudice lacks merit.

We will affirm the judgment.

2

BACKGROUND

Siskiyou County Sheriff's Deputy Adam Zanni saw a significant number of marijuana plants growing under a tarp on defendant's 40-acre property during aerial surveillance. Deputy Zanni conducted a second aerial surveillance over defendant's property two months later. He saw the tarp had been removed and some of the marijuana plants had been harvested.

Deputy Zanni and 10 other law enforcement officers subsequently went to defendant's property to execute a search warrant for marijuana and evidence of marijuana sales. There were a number of buildings on defendant's property. There was a main residence, a new single family dwelling that was under construction, a four-car garage or shop with a studio apartment above it, two barns, a chicken coop, a standing carport, and three portable carports. Defendant and his wife Loma Lee Brookbank lived in the main residence.

As Deputy Zanni drove onto the property, defendant came out of the main residence. Defendant spoke with Deputy Zanni in front of the main residence. Deputy Zanni told defendant he had a search warrant for marijuana.

Deputy Zanni asked defendant if he was growing marijuana on the property. Defendant said he had 30 marijuana plants. Deputy Zanni asked defendant if he had processed marijuana. Defendant was hesitant, but ultimately said he had been growing marijuana with two other people, and he had harvested all the marijuana. According to Deputy Zanni, defendant said he had a small amount of processed marijuana for personal use, he gave the other people their marijuana, and he gave what was left over to friends. Defendant told Deputy Zanni marijuana was being grown in the shop. Defendant unlocked the shop door. Defendant then asked to speak with an attorney and stopped talking to Deputy Zanni.

At some point in time, Brookbank showed Deputy Zanni two medical marijuana recommendations. Dr. Robert Sullivan, a physician licensed to practice medicine in

3

California, issued a recommendation for medical marijuana for defendant about three months prior to the execution of the search warrant. Dr. Sullivan had the legal authority to issue recommendations for medical marijuana. Dr. Sullivan recommended two ounces of marijuana per week for defendant. Dr. Sullivan issued a recommendation for medical marijuana for Brookbank in the amount of half an ounce per week.

Officers found an indoor marijuana grow in defendant's shop. The bottom floor of the shop contained a main grow area, a "mother room," and a "baby room." The main grow area contained 30 mature, female marijuana plants, each three to four feet in height. There were 14 mature, female marijuana plants in the "mother room". There were 144 healthy, baby plants in the "baby room." The baby plants had an average height of three inches. Deputy Zanni and Deputy Darrell Lemos opined each marijuana plant can produce a quarter to half a pound of bud or cola at harvest time.

Detective Zanni explained a grower can grow new female marijuana plants by taking clippings from a "mother plant." Only female marijuana plants produced buds or colas, which were the part of the marijuana plant with the highest content of tetrahydrocannabinol (THC). Law enforcement officers considered marijuana plants to be mature when the plant was developed sufficiently so that it can be determined whether it was a male or female plant. Growers typically got rid of a marijuana plant once it was determined the plant was a male plant because if the male plant pollinated the female plant, the female plant will not produce buds. Deputy Zanni did not see any male marijuana plants at defendant's property.

Defendant's expert disagreed that any of the marijuana plants on defendant's property were mature. According to the defense expert, a marijuana plant was not mature until it was ready to be harvested.

The plants in the main grow area of the shop were growing under hoods with lights. Some hoods had built-in fans to pull heat into an exhaust system. There were 10 grow hoods with built-in ventilation fans. Those grow hoods cost at least $200 to $400

4

each. Officers found additional grow hoods and high wattage light bulbs in the shop. Those hoods and light bulbs cost several thousand dollars. The grow hoods and lights were powered by ballasts. There were 16 ballasts in the shop. Ballasts cost about $250 to $500 each. The shop also contained a ventilation pipe leading from the bottom floor to the second floor of the shop, exhaust fans, a digital thermometer, timers, and a grow diary. Defendant admitted he tapped into an electrical source illegally to avoid detection by law enforcement. The electricity was illegally diverted to the shop for the indoor grow operation.

In the bottom floor of the shop officers also found a tote with paper grocery bags containing processed marijuana, another tote containing some processed marijuana on stem, three bags that appeared to contain processed marijuana, a triple beam scale, Grodan cubes, and liquid fertilizer. In the upstairs apartment of the shop, officers found plastic totes with marijuana residue. A useable amount of suspected psilocybin mushrooms was located in the freezer in the upstairs apartment.

There were stalks, indicating an outdoor marijuana garden, in an area near the chicken coop. Deputy Zanni said some of the marijuana plants harvested from that area exceeded seven feet tall. Deputy Zanni estimated there were 12 large marijuana plants in the outdoor garden, and each of those plants would have yielded two to five pounds of cola.

Officers found 37 bags of marijuana in one of the barns. Each bag had a quarter to half a pound of marijuana. The marijuana was placed 15 to 20 feet above the ground.

Officers found a bag containing processed marijuana and a Tupperware container containing what appeared to be brownies that tested positive for THC in a refrigerator in one of the carports.

In the main residence, officers found burnt marijuana cigarettes and a Tupperware container with what Deputy Zanni believed was concentrated cannabis under the kitchen sink, a Tupperware container with what Deputy Zanni suspected were psilocybin

5

mushrooms and a pipe for smoking marijuana in the master bedroom, and marijuana buds in the living room. Concentrated cannabis is the active ingredient from the marijuana plant without any plant material in it. Deputy Zanni did not field test the substance he believed was concentrated cannabis. He opined the marijuana found in the main residence, which weighed no more than two ounces, appeared to be for personal use. The People did not have the suspected psilocybin mushrooms tested.

There were medical marijuana recommendations with the name, address, date of birth, date, and signatures blotted out in defendant's filing cabinet. The filing cabinet also contained a document Deputy Zanni opined was a receipt for the sale of marijuana for $17,100. Officers also found four loaded firearms in the main residence.

In total, officers seized 14 to 15 pounds of marijuana buds from defendant's property. According to Deputy Zanni, marijuana like the type recovered from defendant's property sold for $2,000 to $2,500 per pound for outdoor grown marijuana, and $2,500 to $3,500 per pound for indoor grown marijuana.

Deputy Zanni opined, based on his training and experience and the evidence found at defendant's property, that defendant had been growing marijuana for a long time and defendant knew what he was doing. Deputy Zanni described the system in the main grow area as pretty sophisticated. Deputy Zanni said defendant and Brookbank's medical marijuana recommendations allowed them to have a total of eight pounds of marijuana for medical purposes per year. Defendant had six pounds over what he was supposed to have. Deputy Zanni opined defendant possessed the marijuana and the marijuana plants found on his property for purposes of sale, and not for medical use. The opinion was based on what he saw during surveillance of defendant's property, the amount of marijuana officers seized from the property, how the marijuana was hidden and packaged, the indicia of the indoor grow, the theft of power, the altered marijuana recommendations, and the sales receipt for marijuana.

Christopher Conrad, a marijuana expert, testified for the defense. Conrad determined 11.4 pounds of marijuana buds and about 19 pounds of leafy marijuana material were seized from defendant's property. Conrad re-weighed the marijuana buds and leafy materials seized from defendant's property about nine months after the execution of the search warrant. Like Deputy Zanni, Conrad explained the drying of the plant material could account for part of the difference in the weight Conrad obtained and the weight Deputy Zanni recorded.

Conrad said the marijuana plants defendant possessed had no useable medical marijuana because the plants did not have any flowers. He said the leaves of a marijuana plant would have produced only one or two grams of resin.

Conrad opined defendant's operation was not sophisticated because the plants were grown in soil and were hand watered. He said the operation was consistent with a medical marijuana garden for personal use by more than one person. Conrad explained a grower needed to constantly replace his marijuana plants because harvesting will kill the plant. Conrad had not seen medical marijuana recommendations in connection with this case for anyone other than defendant and Brookbank.

Brookbank testified at the trial. She said she was a medical marijuana patient and cultivated marijuana for her own use. She never grew marijuana without a doctor's recommendation. She primarily ate marijuana. But she also used it in a salve for her arthritis and smoked it occasionally for nausea.

Brookbank said Adam Nemec planted 24 marijuana plants for defendant and Brookbank.[1] Only 11 of those plants were "successful." Brookbank testified that the marijuana was for defendant, Brookbank and the Nemecs to share. Brookbank said she saw the Nemecs' medical marijuana recommendations.

---

[1] For clarity we will refer to Adam by his first name and to Adam and his wife collectively as the Nemecs.

7

Defendant also testified at the trial. He admitted he planted marijuana in an outdoor garden with Adam. Defendant said he grew those marijuana plants with Brookbank and the Nemecs, and harvested the plants with Brookbank and Adam. Defendant processed the harvested marijuana and placed the buds in half-pound bags. He said he hid the processed marijuana in bales of hay in the barn.

With regard to the marijuana plants found in his shop, defendant said he cut a large number of clones because he always lost a lot. The clones were created before he got the mother plants. Defendant said he had the mother plants for 10 to 12 days before the search. According to defendant, Adam gave defendant the 30 marijuana plants that were in the main grow area for the purpose of growing the plants together.

Defendant testified the marijuana found on his property on the date of the search was for the personal use of defendant, Brookbank, and the Nemecs for their medical needs. Defendant said Brookbank had breast cancer, defendant had insomnia, and it was defendant's understanding the Nemecs had medical marijuana recommendations.

Defendant explained the altered recommendations officers found were scrap paper. He denied any intent to distribute the altered recommendations. He said the document Deputy Zanni described as a sales receipts for marijuana was a souvenir from a visit to a marijuana dispensary. Defendant claimed the mushrooms found in his house were amanita muscaria, not psolocybin. And he said the suspected psilocybin mushrooms found in the shop did not belong to him. He said the Nemecs lived in the apartment above the shop where the mushrooms were located.

Adam testified for the People. He said he performed ranch and construction work on defendant's property. Adam denied helping defendant plant marijuana. He said defendant required him to help with the outdoor marijuana garden. Adam claimed there was no arrangement to give him any portion of the marijuana. Adam said when he moved off defendant's property before the execution of the search warrant, all of the marijuana from the outdoor garden had been harvested and he did not take any portion of the

8

harvested marijuana. Adam also testified defendant asked for permission to use the Nemecs' medical marijuana recommendations to say defendant was growing marijuana as part of a co-op, and Adam refused.

The jury convicted defendant of cultivating marijuana ( Health & Saf. Code, § 11358 - count two),[2] possessing marijuana for sale (§ 11359 - count three), and theft of utility services (Pen. Code, § 498, subd. (b) - count five). The jury found true the allegations in counts two and three that defendant was armed with a firearm. (Pen. Code, § 12022, subd. (a)(1).) The jury acquitted defendant of the count one charge of possessing concentrated cannabis and the count four charge of possessing psilocybin mushrooms.

The trial court sentenced defendant to an aggregate term of three years and eight months. Defendant was sentenced to the midterm of two years on count two, a consecutive one-year term on the Penal Code section 12022, subdivision (a)(1) finding in count two, a concurrent term of two years on count three, a concurrent one-year term on the Penal Code section 12022, subdivision (a)(1) finding in count three, and a consecutive term of eight months on count five. The trial court stayed execution of the sentence, placed defendant on five years of formal probation with 365 days in jail, and ordered credit for time served.

DISCUSSION

I

Defendant contends the trial court erred in failing to instruct the jury on the CUA in connection with the count three charge of possession of marijuana for sale.

" ' "In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole . . . [and] assume that the jurors

---

[2] Undesignated statutory references are to the Health and Safety Code.

9

are intelligent persons and capable of understanding and correlating all jury instructions which are given." [Citation.]' [Citation.] 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' [Citation.]" (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.) Applying these principles, we find no error.

The CUA was approved by voter initiative in 1996 "[t]o ensure that seriously ill Californians have the right to obtain and use marijuana for medical purposes where that medical use is deemed appropriate and has been recommended by a physician who has determined that the person's health would benefit from the use of marijuana in the treatment of cancer, anorexia, AIDS, chronic pain, spasticity, glaucoma, arthritis, migraine, or any other illness for which marijuana provides relief." (§ 11362.5, subd. (b)(1)(A).) The measure added section 11362.5, which provides an affirmative defense to prosecution for the crimes of possession and cultivation of marijuana. (*People v. Dowl* (2013) 57 Cal.4th 1079, 1086 (*Dowl*); *People v. Kelly* (2010) 47 Cal.4th 1008, 1013 (*Kelly*).) The CUA provides that section 11357 (possession of marijuana) and section 11358 (cultivation of marijuana) shall not apply to a patient or to a patient's primary caregiver who possesses or cultivates marijuana for the personal medical purposes of the patient, upon the written or oral recommendation or approval of a physician. (§ 11362.5, subd. (d).)

The California Supreme Court has observed that the CUA "is a narrow measure with narrow ends." (*People v. Mentch* (2008) 45 Cal.4th 274, 286, fn. 7; see *Ross v. RagingWire Telecommunications, Inc*. (2008) 42 Cal.4th 920, 929.) Section 11362.5 permits a patient or primary caregiver to possess or cultivate marijuana only in an amount that is reasonably related to the patient's current medical needs. (*Kelly, supra,* 47 Cal.4th at pp. 1043, 1049.) The statute does not authorize the possession for sale or the sale of marijuana. (§ 11362.5, subd. (b)(2) ["Nothing in this section shall be construed to supersede legislation prohibiting persons from engaging in conduct that endangers others,

nor to condone the diversion of marijuana for nonmedical purposes."]; *People v. Urziceanu* (2005) 132 Cal.App.4th 747, 773.)

The Legislature enacted the MMPA in 2003 to clarify the scope of the application of the CUA, to address additional issues that were not included within the CUA which must be resolved in order to promote the fair and orderly implementation of the statute, and to facilitate the prompt identification of qualified patients and their designated primary caregivers in order to avoid unnecessary arrest and prosecution of those individuals. (*People v. Wright* (2006) 40 Cal.4th 81, 93 (*Wright*).) While the MMPA provides an affirmative defense to the crime of possessing marijuana for sale by persons entitled to the protections of the CUA, it does not authorize the distribution of marijuana for profit. (§§ 11362.7, subds. (f), (g), 11362.765, subds. (a), (b).)

The totality of the trial court's instructions here correctly informed the jury it may not convict the defendant of possessing marijuana for sale if defendant possessed marijuana for personal medical purposes. The trial court said the CUA allows a person to possess or cultivate marijuana for personal medical purposes when a physician has recommended such use, and the amount of marijuana possessed or cultivated must be reasonably related to the patient's current medical needs. With regard to the count three charge, the trial court instructed that the jury may convict defendant of possessing marijuana for sale only if the jury found defendant intended to sell marijuana. The trial court defined selling as "exchanging the marijuana for money, services or anything of value." The trial court said defendant did not have the requisite intent for the crime of possession of marijuana for sale if he mistakenly believed other people were cultivating marijuana with him, and each possessed valid medical marijuana recommendations. The trial court said the jury must find defendant not guilty on the count three charge if the jury had reasonable doubt about whether defendant had the specific intent required for possession of marijuana for sale. The trial court told the jury to consider the instructions together.

Defendant's instructional error claim has no merit.

11

II

Defendant next claims the trial court erred in defining marijuana too narrowly in connection with the count two charge of illegally cultivating marijuana.

For purposes of the CUA, marijuana is "all parts of the plant Cannabis sativa L., whether growing or not; the seeds thereof; the resin extracted from any part of the plant; and every compound, manufacture, salt, derivative, mixture, or preparation of the plant, its seeds or resin. It does not include the mature stalks of the plant, fiber produced from the stalks, oil or cake made from the seeds of the plant, any other compound, manufacture, salt, derivative, mixture, or preparation of the mature stalks (except the resin extracted therefrom), fiber, oil, or cake, or the sterilized seed of the plant which is incapable of germination." (§ 11018.) Courts have construed the term marijuana to include all plants popularly known as marijuana that contain THC. (*People v. Hamilton* (1980) 105 Cal.App.3d 113, 117; *People v. Van Alstyne* (1975) 46 Cal.App.3d 900, 917.)

In contrast with the broad definition of marijuana in section 11018, only the dried mature processed flowers of the female cannabis plant or the plant conversion is considered when determining allowable quantities of marijuana under the MMPA. (§ 11362.77, subd. (d).)

The trial court correctly defined marijuana pursuant to section 11018 when it instructed the jury on the count two charge of unlawfully cultivating marijuana. However, the trial court also said that for purposes of the CUA, marijuana is defined as only the dried mature processed flowers of the female cannabis plant or the plant conversion. The latter statement was incorrect. Nevertheless, the instructional error did not result in prejudice.

As we have explained, the CUA authorizes a patient to possess or cultivate marijuana in an amount that is reasonably related to his current medical needs. (§ 11362.5, subd. (d); *Kelly, supra*, 47 Cal.4th at pp. 1043, 1049; *People v. Trippet* (1997) 56 Cal.App.4th 1532, 1549 (*Trippet*).) The defendant bears the burden of raising

12

a reasonable doubt as to the facts underlying the CUA defense. (*People v. Mower* (2002) 28 Cal.4th 457, 477, 481.) The recommending physician's opinion regarding dosage is one type of evidence relevant to the determination of the amount of marijuana reasonably related to the patient's current medical needs. (*Trippet, supra,* 56 Cal.App.4th at p. 1549.) But ultimately the trier of fact determines the patient's current medical needs. (*Ibid.*) The MMPA does not restrict the quantity of marijuana a patient may possess under the CUA. (*Kelly, supra*, 47 Cal.4th at pp. 1043-1046, 1049.)

The evidence showed that defendant had more marijuana than was reasonably related to his and Brookbank's then-current medical needs. Defendant had a recommendation for two ounces of marijuana per week, and Brookbank had a recommendation for half an ounce of marijuana per week. Those recommendations approved a total of eight pounds of marijuana for medical purposes for defendant and Brookbank per year. Defendant had 44 mature marijuana plants and 144 immature marijuana plants, in addition to a minimum of 11.4 pounds of marijuana buds and about 19 pounds of leafy marijuana material. Deputy Lemos and Deputy Zanni opined each marijuana plant could yield a quarter to half a pound of useable cola at harvest time. There is no evidence all of those plants were reasonably related to the then-current medical needs of defendant or Brookbank.

Moreover, the evidence established beyond a reasonable doubt that defendant intended to sell marijuana. There were 37 bags of marijuana buds hidden in hay bales, 15 to 20 feet above the ground, in defendant's barn. Deputy Zanni had never encountered marijuana used for personal medical purposes stored in that manner. Each bag contained a quarter to half a pound of marijuana, which was a commonly sold quantity for marijuana. Some of the marijuana was packed in plastic turkey baking bags, a commonly used container for packaging marijuana for sale. Defendant also possessed a triple beam scale, something Deputy Zanni said medical marijuana users did not commonly use. Officers found a sales receipt for over $17,000 of marijuana in defendant's home. The

13

sales receipt referenced three pounds of "Smile" and "Eggman." A grow diary containing Brookbank's handwritten notes referenced "Smile" and "Egg." A diary entry dated the same month and year as the sales receipt referenced "box plus two eggs." The diary referenced a substantial amount of marijuana. Defendant also possessed altered medical marijuana recommendations, which Deputy Zanni said defendant could provide to people who bought marijuana from him. Additionally, defendant had 188 marijuana plants.

Defendant claimed the Nemecs had medical marijuana recommendations, and defendant cultivated marijuana for defendant, Brookbank and the Nemecs' medical needs. However, Adam contradicted defendant's claim. Adam's testimony indicates defendant tried to concoct a defense involving the Nemecs' medical marijuana recommendations after the search at defendant's property.

Defendant also contends the trial court's instruction limited his CUA defense to the dried, mature processed or converted marijuana and excluded the plants he was growing. He is correct. However, we see no prejudice in the error. In addition to evidence that defendant possessed more marijuana than was reasonably necessary for his and Brookbank's medical needs, neither party argued the CUA did not protect the cultivation of marijuana plants. To the contrary, the prosecutor explained growing marijuana in an amount reasonably related to a person's current medical needs was protected. But the prosecutor said defendant had more plants than were authorized by the CUA. Defense counsel, in turn, argued defendant grew an amount reasonably related to the medical recommendations for defendant, Brookbank, and the Nemecs. Defense counsel went even further and said there was no rule on how many marijuana plants a patient could have.

Under the circumstances, the error in defining the term marijuana for purposes of the CUA was harmless under any standard of prejudice. (*People v. Fudge* (1994) 7 Cal.4th 1075, 1110-1111.)

14

Defendant also argues the trial court prejudicially erred in sustaining the prosecutor's objection to defense questioning about whether a person can stockpile a two-year supply of medical marijuana.

Defense counsel asked Deputy Zanni, during cross examination, whether a medical marijuana patient who anticipated some sort of disability was permitted to stockpile a two-year supply of marijuana. The prosecutor objected that the question was compound, an improper hypothetical, and sought irrelevant information because only the patient's current medical needs were relevant. Defense counsel said he thought there was no prohibition to "laying in a supply for the future," and the information sought was relevant. The trial court indicated it was inclined to sustain the prosecutor's objection because case law referred to current medical needs, not anticipated or extended medical needs. The trial court said section 11362.77 "speaks to amounts that may be held currently" and the quantities set forth in that statute demonstrate "an anticipation that this is going to be of a short period and not out prolonged into the future." Section 11632.77 provides that a qualified patient may possess no more than eight ounces of dried marijuana and no more than six mature or 12 immature marijuana plants per qualified patient, unless there is a doctor's recommendation that the patient may possess more marijuana. The trial court said section 11362.77 allowed for what was recommended, and Dr. Sullivan's recommendation was for one year only. The trial court invited further research and additional argument. However, defense counsel said he was willing to accept the trial court's indicated ruling.

A trial court's decision to admit or exclude evidence is reviewable for abuse of discretion. (*People v. Vieira* (2005) 35 Cal.4th 264, 292.) We will not disturb the trial court's ruling if it is correct for any reason. (*People v. Smithey* (1999) 20 Cal.4th 936, 971-972; *People v. Zapien* (1993) 4 Cal.4th 929, 976.)

"Within limits, the law permits the examination of an expert witness with hypothetical facts. 'Generally, an expert may render opinion testimony on the basis of facts given "in a hypothetical question that asks the expert to assume their truth." [Citation.] Such a hypothetical question must be rooted in facts shown by the evidence, however.' [Citation.] 'A hypothetical question . . . may be "framed upon any theory which can be deduced" from any evidence properly admitted at trial, including the assumption of "any facts within the limits of the evidence," and a prosecutor may elicit an expert opinion by employing a hypothetical based upon such evidence.' [Citation.] . . . . [¶] Although the field of permissible hypothetical questions is broad, a party cannot use this method of questioning a witness to place before the jury facts divorced from the actual evidence and for which no evidence is ever introduced." (*People v. Boyette* (2002) 29 Cal.4th 381, 449, italics omitted (*Boyette*).)

Even if defendant, Brookbank and the Nemecs had anticipated medical needs for which marijuana would provide relief, there is no testimony they were stockpiling medical marijuana for such future medical needs.[3]  Adam disputed defendant's claim that defendant possessed or cultivated marijuana for Adam's medical needs.  Because there is no evidence supporting the hypothetical scenario defense counsel posed, defense counsel's question was improper.  The trial court did not abuse its discretion in sustaining the People's objection to defense counsel's question.

Citing the trial court's indicated ruling on the objection, defendant argues the trial court erroneously limited the amount of marijuana defendant may possess under the CUA

---

[3] Conrad did not say he had any knowledge about the Nemecs' medical conditions or needs.  Although Adam said he had insomnia, there is no competent evidence about the quantity of marijuana required to meet that medical need.  In addition, there is no evidence about any medical need of Adam's wife.  Conrad admitted he was guessing a little bit about the quantity of marijuana that would be reasonable for two persons with recommendations for unknown amounts of marijuana.

to the amounts stated in section 11362.77, subdivision (a), that is, no more than eight ounces of dried marijuana and no more than six mature or 12 immature marijuana plants per qualified patient.

We do not interpret the trial court's indicated ruling as a cap on the amount of marijuana defendant could possess to meet his then-current medical needs. Rather, the trial court reasoned defendant could possess an amount consistent with his then-current medical needs, but section 11362.77 and defendant's medical marijuana recommendation did not support defense counsel's claim that defendant may stockpile a supply that was "prolonged into the future." The trial court's ruling that defendant may possess only an amount of marijuana reasonably necessary for his then-current medical needs was correct. (*Kelly, supra*, 47 Cal.4th at pp. 1043, 1049.) While the quantity limitations in section 11362.77, subdivision (a) do not restrict the amount of marijuana a patient may possess or cultivate under the CUA, the CUA does not authorize a patient to possess or cultivate an unlimited quantity of marijuana. (*Id.* at pp. 1043-1046, 1049; *Trippet, supra,* 56 Cal.App.4th at pp. 1546 & fn. 8, 1549.)

Defendant further contends the amount of marijuana he may possess under the CUA is not limited to any dosage specified in Dr. Sullivan's recommendations or to the one-year expiration date found on Dr. Sullivan's written recommendations. Defendant is correct that the doctor's recommendation does not limit the amount of marijuana he may possess under the CUA. (*People v. Windus* (2008) 165 Cal.App.4th 634, 642-643 (*Windus*).) But the recommendations are strong evidence of the quantity allowable under the CUA. Defendant points to no other competent evidence showing the then-current medical needs for him, Brookbank and/or the Nemecs.

Defendant cites *Windus* for the proposition that the CUA does not require a recommendation to be renewed. In *Windus*, a doctor gave the defendant a written recommendation for marijuana and recommended the defendant be reevaluated annually. (*Windus, supra,* 165 Cal.App.4th at p. 638.) The doctor's recommendation did not

17

specify a dosage. (*Ibid.*) At the time of his arrest for possession of 1.6 pounds of marijuana for sale, the defendant had not seen the doctor in over three years. (*Id.* at pp. 637-638.) The defendant sought to present a CUA defense. (*Id.* at p. 638.)

The defendant's doctor testified at an evidentiary hearing that the defendant suffered from chronic back pain, and his medical condition when he was arrested was the same as it was when the doctor last saw the defendant. (*Windus, supra,* 165 Cal.App.4th at pp. 638, 641.) The doctor opined it was appropriate for the defendant to have three to six pounds of marijuana for his severe chronic pain. (*Id.* at p. 641.) The trial court ruled the defendant could not present a CUA defense. (*Id.* at p. 639.)

On appeal, the Attorney General in *Windus* argued the defendant's recommendation had expired, and there was no evidence regarding the amount of marijuana the defendant required to satisfy his medical need at the time of his arrest. (*Windus, supra,* 165 Cal.App.4th at p. 641.) The appellate court noted that nothing in the CUA required a patient to periodically renew a doctor's recommendation or imposed an expiration period for a recommendation. (*Ibid.*) There was no evidence the defendant's failure to see the doctor annually invalidated his recommendation. (*Ibid.*) In fact, there was evidence to the contrary. The appellate court concluded the defendant could present evidence on whether he possessed marijuana for his personal medical needs. (*Ibid.*)

Unlike in *Windus*, defendant and Brookbank's recommendations expressly state, "This approval will expire one year from [August 30, 2006]." The trial court's reliance on the expiration date stated in defendant and Brookbank's recommendations was not arbitrary.

The defendant's doctor in *Windus* said the 1.6 pounds of marijuana the defendant possessed was within the amount necessary to meet his then-existing medical needs. (*Windus, supra,* 165 Cal.App.4th at p. 638.) The record in this case contains no similar evidence. Rather, the evidence indicates the then-current medical need for defendant and Brookbank was eight pounds of marijuana per year.

18

We agree with defendant's assertion that, under the CUA, he was entitled to introduce evidence showing the quantity of marijuana he possessed was reasonably related to his then-current medical needs. But the trial court allowed defendant to present such evidence.

The trial court did not err in sustaining the objection. Accordingly, we need not consider defendant's ineffective assistance claim.

IV

Defendant further claims the trial court violated Penal Code section 1054.5 by excluding Conrad's testimony about the average dosage of marijuana prescribed by doctors in California. Defendant claims the exclusion of evidence should have been a sanction of last resort and it violated defendant's constitutional right to present a defense.

A

The People asked defendant to disclose the names and addresses of witnesses defendant anticipated calling at trial, oral statements by defense experts, and witness statements and reports. The People subsequently moved to compel discovery from defendant, contending defendant had not provided any discovery to the People. In response to the motion, defendant produced a two-page response listing five witnesses. Defendant did not disclose Conrad as a potential witness, and did not produce any statement or report by Conrad. The trial court ordered defendant to produce the requested discovery by July 16, 2010.

Later, the People made the same request for discovery on defendant's subsequent counsel. Having received no response to the request, the People moved to compel discovery. The attorney who ultimately represented defendant at trial represented defendant at the hearing on the People's motion. The People asked defendant to provide the name of his expert if he intended to offer a CUA defense and a report of what the expert would say. The trial court ordered defendant to provide the requested information by July 24, 2011. A trial date of September 13, 2011, was set at that time.

19

On July 26, 2011, defense counsel informed the prosecutor the defense had retained Conrad as its expert, and Conrad had an opinion on the "actual quantity of useable marijuana." Defendant did not say what opinion Conrad held.

The People moved to exclude Conrad's testimony and all expert testimony regarding the CUA and the MMPA as a discovery sanction against defendant. The trial court continued the People's motion to allow the parties to meet and confer about discovery issues. The trial date was continued to January 4, 2012, upon defendant's motion.

Defendant provided the People a copy of Conrad's September 7, 2007 notes and a December 21, 2011 letter summarizing what Conrad told defendant's trial counsel. Except for records from Dr. Sullivan, defendant provided no discovery with regard to the amount of marijuana reasonably related to any person's current medical needs.

The People moved in limine to sanction defendant for disobeying the trial court's discovery orders by limiting Conrad's testimony to what was described in the materials disclosed to the prosecutor. The trial court said what defendant had produced was inadequate to help the People prepare their case. The trial court suggested an evidentiary hearing to allow the People to hear what Conrad would say at trial.

Conrad testified outside the presence of the jury. He said he met numerous times with defense counsel between September 7, 2007, and December 21, 2011, and he took photographs as part of his investigation. Conrad said the December 21, 2011 and September 7, 2007 letters were the only writings of his communications with defense counsel that he was aware of. Conrad said he did not know of anything he would testify about at trial that was not contained in the December 21, 2011 and September 7, 2007 letters, except for a conversation he had with a Dr. Denny in March 2008. Defense counsel similarly represented the subject matter of Conrad's expected trial testimony would "be generally the same" as that described in the disclosed letters, but the trial testimony "may go into a little bit greater detail." After hearing argument, the trial court

20

granted the People's motion to limit Conrad's testimony to the information provided in the December 21, 2011 and September 7, 2007 letters discovered to the People. The disclosed letters did not state Conrad would offer an opinion about the average dosage of marijuana prescribed by doctors in California.

Nonetheless, during his direct examination of Conrad, defense counsel asked, "Do you have any idea what the average amount prescribed for a person is in this state?" Conrad answered, "Most doctors don't put any quantity because it ranges from 12 pounds or so down to a few ounces per patient. So the doctors generally don't . . . specify and the California Medical Association's attorney has advised them to not do so." The People moved to strike the testimony based on the trial court's ruling on the People's in limine motion. Defense counsel withdrew the question. The trial court sustained the prosecutor's objection and struck Conrad's answer.

B

Penal Code sections 1054 et seq. governs discovery in criminal cases. The purpose of the statute "is to promote ascertainment of truth by liberal discovery rules which allow parties to obtain information in order to prepare their cases and reduce the chance of surprise at trial. [Citation.] Reciprocal discovery is intended to protect the public interest in a full and truthful disclosure of critical facts, to promote the People's interest in preventing a last minute defense, and to reduce the risk of judgments based on incomplete testimony." (*People v. Jackson* (1993) 15 Cal.App.4th 1197, 1201 (*Jackson*).)

Penal Code section 1054.3 requires a defendant and his attorney to disclose to the prosecutor the names and addresses of persons, other than the defendant, the defendant reasonably anticipates will likely be called as witnesses at trial. (Pen. Code, § 1054.3, subd. (a)(1); *Izazaga v. Superior Court* (1991) 54 Cal.3d 356, 375.) A defendant and his attorney must also disclose any relevant written or recorded statements of those witnesses or reports of the statements of those persons, including any reports or statements of

21

experts made in connection with the case. (Pen. Code, § 1054.3, subd. (a)(1).) The obligation to disclose exists even if a defense expert did not create a written report. (*People v. Lamb* (2006) 136 Cal.App.4th 575, 580 [defendant was still obligated to provide discovery even though his accident reconstruction expert did not prepare a report where the expert made notes about interviews with witnesses, made calculations to determine the cause of the accident, made notes about his inspections of the vehicles, and conveyed this information and his opinion orally to defense counsel].)

The required disclosures must be made at least 30 days prior to the trial, unless good cause is shown why a disclosure should be denied, restricted, or deferred. (Pen. Code, § 1054.7.) If the material and information becomes known to, or comes into the possession of, a party within 30 days of trial, disclosure shall be made immediately, unless good cause is shown why a disclosure should be denied, restricted, or deferred. (Pen. Code, § 1054.7.) "Good cause" means threats or possible danger to the safety of a victim or witness, possible loss or destruction of evidence, or possible compromise of other investigations by law enforcement. (Pen. Code, § 1054.7.)

The trial court may make an order requiring disclosure upon a showing that a party has not complied with the required discovery disclosure provisions. (Pen. Code, § 1054.5, subd. (b).) The court may make any order, including, but not limited to, immediate disclosure, contempt proceedings, delaying or prohibiting the testimony of a witness or the presentation of real evidence, or continuance of the matter. (*Ibid.*) The court may prohibit the testimony of a witness only if all other sanctions have been exhausted. (Pen. Code, § 1054.5, subd. (c).) The trial court's discovery sanction order is reviewed for abuse of discretion. (*People v. Superior Court* (*Mitchell*) (2010) 184 Cal.App.4th 451, 459; *People v. Lamb, supra*, 136 Cal.App.4th at p. 581.)

Here, the trial court twice ordered defendant to disclose the names and addresses of witnesses defendant anticipated calling at trial and any statements and reports by defense experts. In particular, the trial court's June 2011 order required defendant to

provide the name of his expert with regard to his CUA defense and a written report of what that expert would say. Defendant must have anticipated presenting a CUA defense given defendant's statements to Deputy Zanni on the day of the search. And Conrad examined the marijuana seized from defendant's property in 2007. Yet defendant did not disclose Conrad as a potential witness until July 2011. Defendant did not produce any writing concerning what Conrad would testify about until late 2011, shortly before the start of trial. There is no showing of good cause why defendant waited more than four years to provide the People with a copy of Conrad's September 7, 2007 letter.

Under the circumstances, an order requiring immediate disclosure, contempt, or a continuance were not proper remedies. (*Jackson, supra,* 15 Cal.App.4th at p. 1203 [exclusion of defense witness's testimony is proper where lesser sanctions would not have been adequate].) The complaint against defendant was about four years old, and the trial court had already indicated it would not grant any further trial continuances. Moreover, Conrad and defense counsel represented that the December 21, 2011 and September 7, 2007 letters described what Conrad would testify about at the trial. Those letters do not state Conrad would render an opinion about the typical practice of doctors in California in prescribing marijuana.

The trial court's order was limited in scope. The trial court permitted defendant to present Conrad's testimony, but limited the scope of the testimony to the subjects described in the disclosed letters. In light of the trial court's discovery orders, defendant's late disclosure, and defense counsel's representation that the disclosed letters stated what Conrad would testify about at trial, allowing defendant to present evidence beyond the scope of the disclosed letters would not only have prejudiced the People, who did not have an expert on what California doctors typically recommended, but would also have encouraged non-compliance with pretrial discovery rules and discovery orders. The trial court did not abuse its discretion in limiting Conrad's testimony.

In any event, we perceive no prejudice resulting from the order excluding Conrad's testimony about the average dosage in California. The CUA permitted defendant to possess or cultivate marijuana in a quantity reasonably related to his then-current medical needs, not an average dosage. (*Kelly, supra,* 47 Cal.4th at pp. 1043, 1049.) Dr. Sullivan specified a dosage for defendant and Brookbank. Defendant did not dispute those recommended amounts. Therefore, whether California doctors typically do not specify a dosage amount in their recommendations is of no consequence. Under the present facts, the trial court's order does not violate defendant's right to present evidence. (*Jackson, supra,* 15 Cal.App.4th at pp. 1203-1204; see *Taylor v. Illinois* (1988) 484 U.S. 400, 414-415 [98 L.Ed.2d 798, 814] [the defendant's right to present evidence must be weighed against the integrity of the adversary process, which depends both on the presentation of reliable evidence and the rejection of unreliable evidence, the interest in the fair and efficient administration of justice, and the potential prejudice to the truth-determining function of the trial process].)

Defendant says Conrad was entitled to give the excluded opinion under the trial court's ruling. Not so. The disclosed letters did not state that Conrad would offer an opinion about the average dosage doctors prescribed in California.

Defendant also claims the trial court and trial counsel incorrectly informed the jury that Dr. Sullivan's recommendations determined what was reasonably related to the medical needs of defendant and Brookbank. We conclude there was no instructional error. Although defense counsel incorrectly said that Dr. Sullivan determined what was reasonable and the jury could not question Dr. Sullivan's determination, the trial court's instructions to the jury do not say that the doctor's recommendations dictated what was reasonably related to defendant and Brookbank's medical needs.[4] We presume the jury

---

[4] The trial court instructed, in relevant part, "Possession or cultivation of marijuana is lawful if authorized by the Compassionate Use Act. The Compassionate Use Act allows

followed the trial court's instructions. (*Boyette, supra,* 29 Cal.4th at p. 436.) Moreover, the prosecutor did not argue that Dr. Sullivan's recommendations dictated the amount of marijuana defendant may possess or cultivate under the CUA. The prosecutor argued, "It's not what the patient says. It's not what the doctor says. It's what you say." Although the prosecutor said the doctor's recommendation "defined" how much marijuana defendant and Brookbank could possess, he also said the jury will decide how much marijuana a person needed. And the prosecutor subsequently repeated that the jury must decide what was reasonably related to a medical condition. That statement was consistent with the law. (*Trippet, supra,* 56 Cal.App.4th at p. 1549.)

V

Defendant next argues that his convictions on count two (illegally cultivating marijuana) and count three (possessing marijuana for sale) must be reversed because there is no substantial evidence that Deputy Zanni and Deputy Lemos had any expertise in differentiating between persons who possess marijuana for personal medical needs and those who possess marijuana for sale.

The claim that evidence is insufficient to establish that a witness is qualified to render an expert opinion may not be raised on appeal if the defendant failed to object on that ground in the trial court. (*Dowl, supra*, 57 Cal.4th at pp. 1087, 1089.) This rule of forfeiture allows the trial court to " 'take steps to prevent error from infecting the remainder of the trial' and to develop an adequate record." (*Id*. at p. 1087.) Because a

_____

a person to possess or cultivate marijuana for personal medical purposes when a physician has recommended such use. The amount of marijuana possessed or cultivated must be reasonably related to the patient's current medical needs." [¶] The People have the burden of proving beyond a reasonable doubt that the defendant was not authorized to possess or cultivate marijuana for medical purposes. If the People have not met this burden you must find the defendant not guilty of this crime." The trial court also told the jury, "You must follow the law as I explain it to you even if you disagree with it. If you believe that the attorneys's [*sic*] comments on the law conflict with my instructions, you must follow my instructions."

25

party offering expert testimony need not establish the witness's qualifications absent an objection, an opposing party's failure to object at trial also denies the offering party the opportunity to provide additional testimony to lay a foundation for the expert's testimony. (*Id.* at p. 1088.)

Defendant did not object at trial to Deputy Zanni or Deputy Lemos's qualifications to testify. He thereby forfeited his appellate claim. In any event, the claim lacks merit.

Deputy Zanni was a 14-year veteran with the Siskiyou County Sheriff's Department. He received training on medical marijuana from the California Narcotics Officers Association. He worked on hundreds of investigations involving marijuana. In about 100 of the cases he investigated, individuals presented him with medical marijuana recommendations that appeared valid, and he accepted those recommendations. He talked to hundreds of people who cultivated marijuana, including persons who cultivated marijuana for medical use. He talked to people about their medical marijuana needs, possession, and cultivation. He had seen medical marijuana. Deputy Zanni was assigned to the Siskiyou County Sheriff's Department Marijuana Eradication Team. That team investigated all marijuana-related crimes and kept current with medical marijuana trends.

Deputy Zanni testified about the practices of medical marijuana users. He said, for example, that medical marijuana users commonly kept marijuana in their homes. He opined that the marijuana found in defendant's living room appeared to be "personal use amounts."

Deputy Zanni also received training on indoor and outdoor cultivation, processing, packaging, sale and identification of marijuana. He primarily investigated marijuana offenses for four and a half years, and had worked on hundreds of investigations involving marijuana and illegal marijuana processing operations.

The expert in *People v. Chakos* (2007) 158 Cal.App.4th 357, 361, a case defendant cites, had no expertise in distinguishing lawful marijuana possession and possession of marijuana for sale. (*Id.* at pp. 367-368.) Here, Deputy Zanni had training and experience

26

in distinguishing between lawful and unlawful marijuana possession. The record does not support defendant's claim that Deputy Zanni was not qualified to render an opinion about whether marijuana was possessed or cultivated for personal medical use or for sale.

Defendant argues Deputy Lemos was also unqualified to testify as an expert on medical marijuana needs and practices. But defendant does not cite the portion of the record where such testimony appears. Based on our review of the record, it does not appear that Deputy Lemos rendered an opinion about whether defendant possessed or cultivated marijuana for sale or for personal use.

In view of our conclusions, we need not address the parties' arguments about whether the People are required to present expert testimony on the acquisition and use of marijuana for medical purposes whenever the defendant raises a CUA defense.

VI

Defendant also claims Deputy Zanni should not have been permitted to testify about the provisions of the CUA and the MMPA. But defendant did not preserve this claim for review because he did not object at trial to the admissibility of the testimony he now challenges. (Evid. Code, § 353, subd. (a); *People v. Demetrulias* (2006) 39 Cal.4th 1, 19-20.) In the alternative, defendant argues his trial counsel was incompetent for failing to object to particular portions of Deputy Zanni's testimony.

To establish ineffective assistance of trial counsel, defendant must prove (1) trial counsel's representation was deficient because it fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficiency resulted in prejudice to the defendant. (*People v. Maury* (2003) 30 Cal.4th 342, 389 (*Maury*); *Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 692-693].) If defendant makes an insufficient showing on either one of these components, his ineffective assistance claim fails. (*People v. Holt* (1997) 15 Cal.4th 619, 703; *Strickland v. Washington*, *supra*, 466 U.S. at p. 687 [80 L.Ed.2d at 693].)

27

The California Supreme Court has said it is particularly difficult to prevail on an ineffective assistance of counsel claim on direct appeal.  (*People v. Mai* (2013) 57 Cal.4th 986, 1009 (*Mai*).)  We review trial counsel's performance with deferential scrutiny, indulging a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance and recognizing the many choices that attorneys make in handling cases and the danger of second-guessing an attorney's decisions.  (*Maury, supra*, 30 Cal.4th at p. 389; *Strickland v. Washington, supra*, 466 U.S. at p. 689.)  Counsel is not ineffective for failing to make a meritless objection or motion.  (*People v. Weaver* (2001) 26 Cal.4th 876, 931.)  Additionally, "[t]actical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts.  [Citation.]"  (*Maury, supra*, 30 Cal.4th at p. 389.)  "On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.  All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding."  (*Mai, supra,* 57 Cal.4th at p. 1009.)

"Moreover, prejudice must be affirmatively proved; the record must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citation.]"  (*Maury, supra,* 30 Cal.4th at p. 389)  It is not enough for defendant to show that errors had some conceivable effect on the outcome of the case.  (*People v. Ledesma* (1987) 43 Cal.3d 171, 217.)  Defendant must show a reasonable probability of a more favorable result.  (*Id.* at pp. 217-218; *Strickland v. Washington, supra*, 466 U.S. at pp. 693-694.)

Defendant objects to three parts of Deputy Zanni's direct examination testimony. In the first two challenged portions of the deputy's testimony, the prosecutor asked Deputy Zanni about mature and immature marijuana plants. The prosecutor asked,

"Q. Now under the [CUA] people may have a certain number of immature plants. Fair statement?

"A. Yes.

"Q. And how do you as a peace officer distinguish between immature plants and mature plants?

"A. As a peace officer we use the phrase 'mature' and 'immature' as being -- that we can recognize if it's a female plant or a male plant. If the plants aren't of [an] age where we can tell if it is a female plant or a male plant, we call it immature. If we can tell it is a female plant, we're going to call it mature because we can tell.

"Q. So under the legislation passed by the California Legislature a person may possess at least 6 mature or 12 immature plants?

"A. Correct.

"Q. And you as a peace officer differentiated --

"MR. WEBSTER: Your honor, I think that is a misstatement of the law.

"THE COURT: All right, counsel. Can we have a brief side bar?

[¶] . . . [¶]

"THE COURT: All right. Ladies and gentlemen, there is an objection. The Court is sustaining the objection. But in a chambers conference or just briefly in a side bar it was agreed that the law itself is somewhat confusing. And rather than try to explain the law through a witness, the Court will read the section to you that is being discussed here at the moment. [The trial court then read section 11362.77, subdivisions (a) and (b) to the jury.]"

A witness's opinion about what the law provides is inadmissible. (*People v. Torres* (1995) 33 Cal.App.4th 37, 45-46.) " 'It is the court and not the witness which

29

must declare what the law is, it not being within the province of a witness, for example, to testify as to what constitutes larceny or burglary.' " (*Ibid.*) It was improper for Deputy Zanni to testify about what the CUA permitted. While defense counsel objected that Deputy Zanni misstated the law, however, the record does not disclose why defense counsel did not object on the ground that Deputy Zanni cannot testify about what the CUA provided. Defense counsel could have elected not to object because the trial court was going to instruct the jury about the provisions of the CUA and that the jury must follow the trial court's instructions on the law. We will not second-guess trial counsel's tactical decisions.

Additionally, defendant has not shown the result of the trial would probably have been more favorable to him had his trial counsel objected to Deputy Zanni's testimony. The trial court read the provisions of section 11362.77 to the jury, and instructed on the CUA. The trial court said the jury must follow its instructions on the law. We reject defendant's ineffective assistance claim with regard to the above portions of Deputy Zanni's testimony.

In the next challenged portion of Deputy Zanni's testimony, the deputy said, based on a doctor's recommendation for two ounces per week, defendant had a recommendation for six and a half pounds of marijuana per year. Deputy Zanni also said if Brookbank had a recommendation for half an ounce per week, it would be one and a half pounds a year. Using the weight the deputy recorded days after the search, the deputy concluded defendant had six more pounds of marijuana than Dr. Sullivan recommended. If the deputy used the weight Conrad obtained, however, the deputy said defendant had two and a half more pounds than recommended.

The following colloquy then occurred:

"Q. [¶] What prevents Mr. Hennig from possessing this extra three to five pounds of marijuana in November 2006, selling it, then growing or otherwise acquiring more

dried, mature, processed, flowered female processed plant and selling that, and repeating the cycle three or four times a year?

"A. If there wasn't law enforcement intervention, nothing."

Defendant argues the latter response is inadmissible opinion about the provisions of the MMPA. Deputy Zanni did not express an opinion regarding the provisions of the MMPA in the cited excerpt.

Defendant also claims his trial counsel was ineffective regarding portions of the deputy's testimony during cross-examination. In the first challenged portion of the cross-examination testimony, Deputy Zanni said he learned the definition of a mature marijuana plant from his training and working with other law enforcement officers. He said he did not know who came up with the definition he learned or whether there was any botanical or horticultural support for his definition of a mature marijuana plant. Defense counsel then asked:

"Q. So this is just essentially a bright line created by law enforcement; correct?

"A. Yes; backed by the legislature, SB 420.

"Q. What did you say?

"A. 11362.77 of the Health and Safety Code, it is sub-section B, I believe, where it says at minimum somebody can possess 8 ounces of dried marijuana or 6 mature or 12 immature plants. And for the basis of that, that's why we say a plant is mature when we can sex it. They can have 6 of the mature plants.

"Q. But the legislature didn't say that; law enforcement says that.

"A. That's how I was trained to tell the difference, with that section.

"Q. But there is no definition of what's a mature plant in SB 420; correct?

"A. No.

"Q. So that is a definition that has been cobbled together by law enforcement for the -- basically law enforcement purposes. Correct?

"A. For the purposes of that section, yes."

31

Deputy Zanni's statement that section 11362.77 permits a person to possess at minimum eight ounces of dried marijuana *or* six mature or 12 immature plants was incorrect. Section 11362.77, subdivision (a) says a qualified patient or primary caregiver may possess no more than eight ounces of dried marijuana and, in addition, no more than six mature or 12 immature marijuana plants per qualified patient. The deputy's opinion about what the law provides was inadmissible. (*People v. Torres, supra,* 33 Cal.App.4th at pp. 45-46.) However, defense counsel could have decided not to object because the trial court had previously instructed the jury on section 11362.77. Moreover, defendant's ineffective assistance claim regarding this portion of Deputy Zanni's testimony fails because defendant has not demonstrated prejudice resulting from the lack of objection. The trial court read the provisions of section 11362.77 to the jury. And as we have explained, there was convincing evidence defendant possessed marijuana for sale.

Defendant also claims ineffective assistance regarding another portion of Deputy Zanni's cross-examination testimony. Deputy Zanni explained that his report did not differentiate between bud and shake because in 2006, the Siskiyou County Sheriff's Department referred to both as "processed marijuana." Deputy Zanni said that after the law changed, he reexamined the material seized from defendant's property in order to differentiate between bud and shake. The trial court interjected:

"THE COURT: Counsel, may I ask a question, please?

"MR. WEBSTER: Sure.

"THE COURT: There has been a few times that the term 'shake' has been used. I don't know that it's ever been defined. Would you ask Detective -- or Deputy Zanni?

"MR. WEBSTER: Q. What's your definition of shake?

"A. It's the processed marijuana that is not the colas or the bud portion of the marijuana plant.

"Q. Basically the leaves and stems?

"A. It's generally the leaf -- the leafy material."

32

On redirect examination, Deputy Zanni said marijuana shake is within the definition of section 11018.

As we have explained, section 11018 defines the term marijuana for purposes of the CUA defense. Deputy Zanni did not state or imply that shake was not included within the defense provided under the CUA, as defendant appears to claim. Defendant's trial counsel did not render ineffective assistance by failing to object to Deputy's Zanni's testimony on the ground defendant asserts. (*People v. Torrez* (1995) 31 Cal.App.4th 1084, 1091 [counsel is not ineffective for failing to make a meritless objection].) Even if the challenged testimony was inadmissible, defendant has not shown that the failure to object resulted in prejudice.

Defendant fails to establish inadequate representation and resulting prejudice. His ineffective assistance claims lack merit.

VII

Defendant also raises claims of prosecutorial misconduct. He says the prosecutor elicited improper testimony and misstated the law.

In general, we will not review a prosecutorial misconduct claim if the defendant did not object to the misconduct in the trial court on the ground raised on appeal and ask the trial court to admonish the jury to disregard the impropriety, unless an objection would be futile or an admonition would not have cured the harm. (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1275; *People v. Kipp* (2001) 26 Cal.4th 1100, 1130 [failure to object on constitutional grounds at trial forfeits appellate contention that prosecutorial misconduct violated constitutional protections]; *People v. Hill* (1998) 17 Cal.4th 800, 820 (*Hill*).) " 'The purpose of the rule requiring the making of timely objections is remedial in nature, and seeks to give the [trial] court the opportunity to admonish the jury, instruct counsel and forestall the accumulation of prejudice by repeating improprieties, thus avoiding the necessity of a retrial.' " (*People v. Brown* (2003) 31 Cal.4th 518, 553.)

Defendant concedes he did not object to the alleged instances of prosecutorial misconduct at trial and he did not request an admonishment to the jury. Referring to his argument in part III of this opinion, defendant claims objecting would have been futile because the trial court shared the prosecutor's misunderstanding of the CUA and the MMPA. We rejected defendant's claim of trial court error in part III, and here he does not establish that an objection would have been futile. His claims of prosecutorial misconduct are forfeited.

Defendant nonetheless argues his trial counsel was ineffective for failing to object to prosecutorial misconduct. We conclude defendant fails to show his trial counsel's representation was deficient.

The record does not support defendant's claims that the prosecutor committed misconduct by eliciting improper testimony from Deputy Zanni and by telling the jury that defendant could not possess more marijuana than Dr. Sullivan had recommended and that the bud is the only part of the marijuana plant protected under the CUA. We shall discuss those claims of misstatements by the prosecutor that are factually supported by the record.

Defendant argues trial counsel was ineffective for failing to object that the prosecutor misstated the law when he said the method by which a patient consumes marijuana is irrelevant.

The prosecutor's statement "there's no law that suggests that you should care how it's consumed" is incorrect in general because the method in which marijuana is consumed may be relevant to the quantity of marijuana necessary for a patient's current medical needs. (See, e.g., *Wright, supra*, 40 Cal.4th at pp. 87-88.) Considered in context, however, there is no reasonable likelihood the jury applied the prosecutor's remarks in an objectionable fashion because there is no evidence the manner in which defendant or Brookbank consumed marijuana required they have more marijuana than is specified in their recommendations. (*People v. Dennis* (1998) 17 Cal.4th 468, 522

34

[we must view the statements to which the defendant objects in the context of the argument as a whole]; *People v. Samayoa* (1997) 15 Cal.4th 795, 841 [when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion].) Although defendant points out Conrad testified in another case that approximately four times the amount of marijuana must be eaten in order to achieve the equivalent effect of smoking it, defendant does not claim similar evidence was presented in this case. Accordingly, we reject this basis for defendant's ineffective assistance claim.

Defendant further argues his trial counsel should have objected when the prosecutor told the jury the Nemecs were entitled to only six ounces of bud each under the CUA.

The prosecutor did not make such a statement. The prosecutor did misspeak when he said the MMPA would give the Nemecs six ounces of marijuana each because section 11362.77, subdivision (a) references "no more than eight ounces of dried marijuana." However, there is no reasonable likelihood the jury applied the prosecutor's statement in an objectionable fashion. It appears the prosecutor's incorrect statement was inadvertent error inasmuch as the prosecutor correctly stated section 11362.77 refers to no more than eight ounces of dried marijuana per qualified patient in other parts of his closing and rebuttal remarks. The prosecutor did not suggest the standard for the amount of medical marijuana the Nemecs may have under the CUA was anything other than the one the prosecutor repeatedly stated in his closing remarks to the jury: "an amount reasonably related to the patient's medical condition." Additionally, the trial court correctly instructed the jury on section 11362.77 and the CUA. And the trial court told the jury it must follow the trial court's instructions on the law if the attorney's comments conflict with those instructions. We presume the jury followed the trial court's instructions. (*Boyette, supra,* 29 Cal.4th at p. 436.)

35

Defendant's ineffective assistance of counsel claim has no merit.

## VIII

Defendant raises additional ineffective assistance of counsel claims, which we address in turn.

## A

Defendant claims his trial counsel was ineffective in agreeing that evidence of defendant's medical condition and Brookbank's medical condition should be excluded.

The prosecutor moved to exclude evidence of the alleged medical conditions, arguing that the jury was required to accept valid marijuana recommendations and may not decide for itself if marijuana is appropriate for a patient's medical condition. The prosecutor also noted that during voir dire, potential jurors expressed the opinion that medical marijuana was being abused. He asserted that although they accepted that the law authorized medical marijuana, the jurors would consider the medical condition. The prosecutor argued that excluding evidence of defendant's and Brookbank's qualifying medical conditions would avoid the problem presented by the jurors' comments during voir dire.

The trial court said that based on the statements by the potential jurors, it also had concerns that the jurors might disregard a medical marijuana recommendation if they believed a medical condition was not an appropriate fit for the recommendation. Defense counsel agreed the real issue was the recommendation. Defense counsel said a properly framed instruction could adequately address the expressed concerns.[5] The trial court granted the People's motion to exclude the evidence.

---

[5] Defendant does not claim instructional error regarding Dr. Sullivan's recommendations. The parties stipulated that Dr. Sullivan had the legal authority to issue recommendations for medical marijuana in California, and the doctor issued recommendations to defendant and Brookbank for specified amounts. The trial court

36

Defendant argues that his trial counsel improperly acquiesced in the exclusion of Dr. Sullivan's required testimony. But trial counsel could have reasonably agreed to exclude evidence of qualifying medical conditions in order to ensure the jury would not nullify the doctor's medical marijuana recommendations. Trial counsel's tactical decision did not prejudice defendant.

B

In a related argument, defendant claims his trial counsel was ineffective because he did not call Dr. Sullivan to testify at trial that the amount of marijuana defendant possessed was reasonable for his medical needs. According to defendant, Dr. Sullivan testified at an evidentiary hearing held outside the presence of the jury that defendant switched to eating marijuana, but Dr. Sullivan could have testified at trial that it takes more marijuana in edible form to meet a patient's needs.

The record does not disclose why trial counsel elected not to call Dr. Sullivan as a witness at trial, but trial counsel could have determined, based on the evidentiary hearing testimony, that Dr. Sullivan could not say it was reasonable for defendant to possess 11.4 pounds or more of marijuana based on defendant's and Brookbank's recommendations.

Contrary to defendant's suggestion, Dr. Sullivan did not say defendant reasonably needed to consume more than two ounces of marijuana per week for his medical conditions. Dr. Sullivan testified at the evidentiary hearing that defendant used one to one and a half ounces of marijuana per week. Defendant ingested marijuana by smoking it, vaporizing it, and eating it. Dr. Sullivan gave defendant a recommendation for "~ 1-1½ ounces" of marijuana per week. Dr. Sullivan said "~ 1-1½ ounces" meant roughly or somewhere in the range of one to one and a half ounces. He said his recommended dosage would allow two ounces per week, but not five pounds per week.

---

instructed the jury to accept the stipulations as facts in the case, and the jury could decide what weight to give those facts.

37

Dr. Sullivan said that after he last saw defendant, defendant ingested marijuana more by eating it. Defendant consulted with Dr. Sullivan's partner six days before the authorities searched defendant's property. Dr. Sullivan's partner increased defendant's recommended dosage to about two ounces per week. The increased recommended dosage may have taken into consideration that defendant was eating marijuana more.

The prosecutor objected to Dr. Sullivan testifying about his partner's opinion, and the trial court sustained the objection. Defendant does not challenge that ruling. There is no evidence about what Dr. Sullivan's partner meant by his recommendation. It was stipulated, however, that defendant had a recommendation for two ounces of medical marijuana per week. There is no evidence defendant required more than two ounces of marijuana per week to meet his medical needs because he consumed marijuana by eating it more. On this record, we cannot say there could be no rational tactical purpose for trial counsel to decide not to call Dr. Sullivan as a witness at trial. We reject defendant's ineffective assistance claim. (*Mai, supra,* 57 Cal.4th at p. 1009; *Maury, supra*, 30 Cal.4th at p. 389.)

C

Defendant further claims his trial counsel should not have agreed to exclude the proffered testimony by Brookbank that (a) she knew of a study about the anti-tumor properties of marijuana, (b) she prepared topical ointments made from marijuana, (c) after the search she did not ingest marijuana and her tumors increased, and (d) she had a marijuana recommendation for two ounces per week at the time of the trial.[6] Defendant

---

[6] The trial court excluded the following proposed testimony by Brookbank: "I was privy to a study at the Mayo Clinic that clinically established that topical use of cannibus [*sic*] derivatives had an anti-tumor effect. . . . [¶] After the raid and confiscation of our medicine and firearms, we became virtually bankrupt due to spending money on lawyers and paying off the Feds to avoid forfeiture of our home and property. We lost 9 llamas to predators as we had no firearms to scare them away. We had to transport some 30 llamas to a large animal sanctuary in Montana for their safety, making two trips. [¶] I had been

38

argues the excluded testimony would have suggested a higher dosage for Brookbank was reasonable and would have explained the extra marijuana in defendant's possession, especially if Dr. Sullivan had testified at trial that recommended dosages are approximate and flexible.

Defendant's contention -- that his counsel was ineffective for agreeing to exclude Brookbank's testimony -- lacks merit because his trial counsel actually opposed the People's motion to exclude those portions of Brookbank's testimony.

In any event, the trial court did not abuse its discretion in excluding the portions of Brookbank's proposed testimony. The trial court ruled that her testimony about what happened after the raid was irrelevant and that any probative value was substantially outweighed by the probability of undue consumption of time, undue prejudice, confusing the issues or misleading the jury. With regard to Brookbank, the amount of marijuana defendant and Brookbank may possess or cultivate under the CUA is the amount reasonably related to Brookbank's medical needs at the time of the search. (§ 11362.5, subd. (d); *Kelly, supra*, 47 Cal.4th at pp. 1043, 1049; *Trippet, supra,* 56 Cal.App.4th at p. 1549.) There is no evidence defendant or Brookbank anticipated the changed medical needs Brookbank described in the excluded portion of her proposed testimony.

D

Defendant next claims his trial counsel incorrectly argued to the jury that Dr. Sullivan was the judge of what was reasonable, and it was not up to the jury to decide that issue. We agree the argument by defendant's trial counsel misstated the law. (*Trippet, supra,* 56 Cal.App.4th at p. 1549.) But defendant fails to demonstrate that

---

without marijuana, as we were destitute, for approximately a year. We had no medical insurance and little money. My tumors increased but with no money or insurance, I neglected my medical care. [¶] I eventually had to have breast cancer surgery in April of 2008, followed by chemotherapy and radiation. I now have a recommendation for 2 ounces of marijuana per week."

39

prejudice resulted from his counsel's incorrect statement. The trial court instructed that the CUA allowed a patient to possess or cultivate marijuana for personal medical purposes in an amount reasonably related to the patient's current medical needs, and the jury determined the facts. The prosecutor repeatedly stated the same CUA standard in his closing and rebuttal statements. The prosecutor told the jury it decides the amount of marijuana defendant may have. Dr. Sullivan's opinion regarding dosage is the only competent evidence concerning the quantity of marijuana required by defendant and Brookbank to meet their then-current medical needs.

Defendant's ineffective assistance of counsel claims fail because defendant has not shown his trial counsel's representation was deficient or that the deficiency resulted in prejudice to defendant. (*Maury, supra,* 30 Cal.4th at p. 389; *Strickland v. Washington, supra,* 466 U.S. at p. 687 [80 L.Ed.2d at pp. 692-693].)

IX

Defendant also claims the trial court erred in admitting his statements to Deputy Zanni because the statements are the product of custodial interrogation and defendant was not advised of his *Miranda* rights.

A

The trial court conducted an evidentiary hearing to decide defendant's objection under *Miranda*. Deputy Zanni was the only witness called at the evidentiary hearing. Deputy Zanni provided the following account.

The deputy and 10 other armed law enforcement officers executed a search warrant on defendant's property. Some officers had automatic weapons. Several officers carried assault rifles. But no officer drew his gun. Deputy Zanni did not recall anyone pointing a weapon at defendant.

When the officers arrived, defendant came out of his home and met the officers. Deputy Zanni and defendant spoke in front of defendant's home. Deputy Zanni told defendant he had a search warrant for the property, and the search warrant was for

40

marijuana.  Defendant was "kind of ambiguous about not wanting [the officers] there."  Deputy Zanni asked defendant if anyone else was on the property.  Defendant said his wife was somewhere on the property.

Deputy Zanni did not order defendant to stay.  Defendant was not placed in handcuffs.  Deputy Zanni did not tell defendant he was detained, even though Deputy Zanni intended to detain defendant during the search for officer safety.  If defendant had walked down the lane or gotten into his vehicle, the deputy would not have allowed defendant to leave.

Deputy Zanni walked 20 to 30 feet away from defendant to speak with two individuals who were on the property doing construction work.  Defendant remained where he was standing and spoke with other officers.  Deputy Zanni spoke with the construction workers for less than 10 minutes and returned to speak with defendant.

Deputy Zanni asked defendant if he and his wife had medical marijuana recommendations.  Defendant said they did.  One or two other deputies were standing with Deputy Zanni.  Deputy Zanni asked defendant if he was growing marijuana and if he had any processed marijuana on the property.  Defendant answered he had 30 marijuana plants and a small amount of marijuana for personal use.  Defendant took Deputy Zanni to the building where he grew marijuana.  One or two other officers accompanied Deputy Zanni and defendant.  The door to the building was locked.  Defendant produced a key and unlocked the door.  Deputy Zanni asked defendant what happened to all the marijuana plants that were grown outdoors.  Defendant responded he grew marijuana with two other people who had recommendations, those persons took their share, and defendant gave the rest of the marijuana to friends.  At about that time, defendant said he no longer wished to speak with Deputy Zanni until he spoke with an attorney.  Deputy Zanni did not ask defendant further questions.  Defendant was not advised of his *Miranda* rights.

41

The trial court ruled defendant was not subjected to custodial interrogation. It said no officer drew his or her firearm, no one told defendant he could not move about the property, and there were no restraints on defendant's freedom of movement to the degree one would associate with a formal arrest. The trial court further found the questions Deputy Zanni asked defendant were investigatory in nature, designed to elicit information to help the officers execute the search warrant, rather than to elicit incriminating statements. Deputy Zanni was permitted to testify about defendant's statements.

B

"To safeguard the uncounseled individual's Fifth Amendment privilege against self-incrimination, the *Miranda* Court held, [individuals] interrogated while in police custody must be told that they have a right to remain silent, that anything they say may be used against them in court, and that they are entitled to the presence of an attorney, either retained or appointed, at the interrogation." (*Thompson v. Keohane* (1995) 516 U.S. 99, 107 [133 L.Ed.2d 383, 391].) "The purposes of the safeguards prescribed by *Miranda* are to ensure that the police do not coerce or trick captive suspects into confessing, [and] to relieve the ' " inherently compelling pressures " ' generated by the custodial setting itself, ' " which work to undermine the individual's will to resist," ' . . . " (*Berkemer v. McCarty* (1984) 468 U.S. 420, 433 [82 L.Ed.2d 317, 330].) The People may not use statements obtained in violation of *Miranda* to establish guilt. (*Id.* at p. 428-429 [82 L.Ed.2d at p. 328].)

We apply federal standards in determining whether the government elicited a defendant's statements in violation of *Miranda*. (*People v. Sims* (1993) 5 Cal.4th 405, 440.) In determining whether a defendant was subjected to custodial interrogation, we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence. (*People v. Thomas* (2011) 51 Cal.4th 449, 476 (*Thomas*).) We independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was obtained in

42

violation of *Miranda*. (*People v. Moore* (2011) 51 Cal.4th 386, 395 (*Moore*); *Thomas, supra,* 51 Cal.4th at p. 476.)

Miranda warnings are required only when a defendant is in custody. (*Stansbury v. California* (1994) 511 U.S. 318, 322 [128 L.Ed.2d 293, 298]; *Miranda, supra*, 384 U.S. at pp. 444, 478-479 [16 L.Ed.2d at pp. 706, 726].) An interrogation is custodial when the defendant is placed under arrest or his freedom of movement is restrained to the degree associated with a formal arrest. (*California v. Beheler* (1983) 463 U.S. 1121, 1125 [77 L.Ed.2d 1275, 1279]; *People v. Leonard* (2007) 40 Cal.4th 1370, 1400 (*Leonard*).) The test for whether a person is in custody is an objective one. (*Stansbury v. California, supra*, 511 U.S. at p. 323 [128 L.Ed.2d at p. 298]; *Leonard, supra,* 40 Cal.4th at p. 1400.) "When there has been no formal arrest, the question [in determining whether a defendant is in custody] is how a reasonable person in the defendant's position would have understood his situation." (*Moore, supra,* 51 Cal.4th at p. 395.) Federal courts have identified some factors which guide our analysis: (1) where the questioning occurred, (2) the number of officers present, (3) the degree of physical restraint placed on the defendant, (4) the length and manner of the questioning, and (5) whether the defendant was told he did not need to answer the questions. (*United States v. Crooker* (1st Cir. 2012) 688 F.3d 1, 11; *United States v. Hinojosa* (6th Cir. 2010) 606 F.3d 875, 883.) The California Supreme Court has similarly stated that all the circumstances of the interrogation are relevant in determining whether a defendant is in custody for purposes of *Miranda*, including the location, length, and form of the interrogation and whether any indicia of arrest were present. (*Moore, supra,* 51 Cal.4th at p. 395; see *People v. Lopez* (1985) 163 Cal.App.3d 602, 608 [listing the following indicia of custody for *Miranda* purposes: (1) whether the suspect has been formally arrested; (2) absent formal arrest, the length of the detention; (3) the location; (4) the ratio of officers to suspects; and (5) the demeanor of the officer, including the nature of the questioning]; *People v. Forster* (1994) 29 Cal.App.4th 1746, 1753 [same].)

In general, we do not consider the subjective views harbored by the police officer and the person being questioned. (*Stansbury v. California, supra*, 511 U.S. at p. 323 [128 L.Ed.2d at p. 298].) An investigating officer's suspicions or beliefs are relevant to our inquiry only if the suspicions or beliefs are communicated to the defendant and would have affected how a reasonable person in the defendant's position would perceive his freedom to leave or if such evidence is relevant in testing the credibility of the officer's account of what happened during the interrogation. (*Id.* at pp. 323-325 [128 L.Ed.2d at pp. 298-300]; *People v. Stansbury* (1995) 9 Cal.4th 824, 830.)

Applying these principles and considering the totality of the surrounding circumstances, we conclude defendant was not in custody at the time he spoke with Deputy Zanni. It is true that Deputy Zanni did not tell defendant he was free to leave or that he did not need not answer questions. However, Deputy Zanni's questioning ceased when defendant said he no longer wished to speak with the deputy. In addition, Deputy Zanni spoke with defendant outside defendant's home. Questioning that takes place in the familiarity of a person's own home tends to be less intimidating than questioning in unfamiliar surroundings like a police station. (*United States v. Crooker, supra,* 688 F.3d at p. 11; *United States v. Hinojosa, supra,* 606 F.3d at p. 883; *United States v. Bassignani* (9th Cir. 2009) 575 F.3d 879, 884-887 [interview took place at the defendant's workplace]; *United States v. Axsom* (8th Cir. 2002) 289 F.3d 496, 502.) The questioning was not protracted. There is no indication any officer restrained defendant, blocked his way, or isolated him before he made the challenged statements to Deputy Zanni. Brookbank joined Deputy Zanni and defendant at one point. Defendant was not placed in handcuffs. Deputy Zanni did not tell defendant he would be detained, and defendant was not placed under arrest.

Although 11 armed law enforcement officers entered defendant's property to execute the search warrant, most of the officers dispersed to search defendant's multiple-acre property. No officer had his or her firearm drawn. And only one or two other

44

officers were around when Deputy Zanni questioned defendant. (*United States v. Crooker, supra,* 688 F.3d at pp. 4, 11-12 [four to eight armed law enforcement officers executed a search warrant at the defendant's home, but no more than two agents questioned the defendant at one time]; *United States v. Axsom, supra,* 289 F.3d at p. 502 [nine agents participated in the execution of a search warrant at the defendant's home but only two agents questioned the defendant].)

No one stopped defendant when he walked to the shop with Deputy Zanni. According to Deputy Zanni, defendant was "very interactive" with the deputy. There is no testimony that the questioning by Deputy Zanni was accusatory in tone. There is also no evidence Deputy Zanni intimidated, coerced, or deceived defendant into answering questions such that a reasonable person under the circumstances would have felt compelled to remain and answer the deputy's questions. Although law enforcement officers entered defendant's property to execute a search warrant, and although Deputy Zanni may have believed crimes had been committed on defendant's property, such circumstances do not mandate a determination that defendant was in custody. (See, e.g., *United States v. Crooker, supra,* 688 F.3d 1; *United States v. Bassignani, supra,* 575 F.3d 879; *United States v. Axsom, supra,* 289 F.3d 496.) Deputy Zanni's unexpressed intent or belief has no bearing on the question of whether defendant was in custody. (*Stansbury v. California, supra*, 511 U.S. at p. 326 [128 L.Ed.2d at p. 301]; *Berkemer v. McCarty, supra*, 468 U.S. at p. 442 [82 L.Ed.2d at p. 336]; *People v. Stansbury, supra,* 9 Cal.4th at p. 830 & fn. 1.)

We do not consider whether Deputy Zanni "interrogated" defendant for purposes of *Miranda* because defendant was not in custody when he made the challenged statements. Defendant has not shown the trial court erred in denying his motion to exclude his statements to Deputy Zanni.

X

Defendant contends the judgment must be reversed because the cumulative effect of the errors by the trial court, his trial counsel, and the prosecutor prejudiced him.

"[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error." (*Hill, supra*, 17 Cal.4th at pp. 844-845.)  This is not such a case.  Having concluded that defendant's claims lack merit, we also reject his claim of cumulative prejudice.

DISPOSITION

The judgment is affirmed.


                                       /S/
                                         Mauro, J.

We concur:


/S/
Blease, Acting P. J.


/S/
Duarte, J.